Filed 6/17/19 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br>CARLOS HUGO MONTIEL,<br><br>     Defendant and Appellant. | A150250<br><br>(Napa County<br>Super. Ct. No. CR175311)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

The opinion filed on May 16, 2019, shall be modified so that the last sentence of the first full paragraph on page 8 is changed to:

Furthermore, the jury was instructed that Dr. Urquiza's testimony was "not evidence that [Montiel] committed any of the crimes charged against him," and although the prosecutor mentioned in closing argument that false allegations in these cases are very rare, the prosecutor did not otherwise elaborate on or emphasize the point.

There is no change in judgment. Rehearing is denied.

Date: _____         _____Acting P.J.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CARLOS HUGO MONTIEL,<br><br>     Defendant and Appellant. | A150250<br><br>(Napa County<br>Super. Ct. No. CR175311) |

After he molested his niece, defendant Carlos Hugo Montiel was convicted by a jury of one count of sexual penetration of a child 10 years of age or younger and one count of lewd or lascivious acts with a child under 14 years old, and he was sentenced to 15 years to life in prison. He contends that his convictions must be reversed because his trial counsel failed to object to expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) that bolstered the victim's credibility. He also claims that the trial court erred by admitting evidence of an uncharged sex offense he committed against the same victim, awarding the victim's mother restitution for noneconomic losses, and imposing victim restitution even though the sentence for the conviction on which it was based was stayed. We are not persuaded and affirm.

In the published portion of our opinion we conclude that the trial court was authorized to award restitution to the victim's mother based on the mother's own psychological harm. In the unpublished portion of our opinion, we reject Montiel's

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., B., and D.

remaining arguments and order the correction of an error involving the abstract of judgment.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

At the time of the charged incident, the victim, Jane Doe, was eight years old. She lived with her parents and her two older brothers in a two-bedroom apartment in Napa County. In March 2015, Montiel moved in with Jane's family. His young daughter would visit and sometimes stay overnight as well. Montiel and his daughter slept in the apartment's living room.

In early April 2015, Jane's mother asked Montiel to babysit Jane and drop her off at cheerleading practice the next day, and he agreed to do so. The next morning, before leaving the apartment, Jane's mother dressed Jane in her cheerleading uniform. After her mother left, Jane sat on the couch and waited until Montiel and his daughter woke up.

At trial, Jane testified that at some point after Montiel and his daughter woke up, Montiel reached under Jane's cheerleading uniform and underwear, inserted one or two fingers into her vagina, and slid them in once or twice, hurting her. When Jane asked Montiel what he was doing, he said he was playing with her. He then excused himself to go to the bathroom. He later returned, got dressed, and took Jane to cheerleading practice.

Later that day, when Jane and her mother were alone, Jane told her mother what Montiel had done. Jane's mother soon told Jane's father and brothers what had happened, but none of them reported the incident to the police, although Jane's parents planned to tell Montiel to leave the house. That evening, Jane, her family, and Montiel attended a family birthday party. Jane's parents instructed Jane and her brothers not to say anything about the incident to anyone at the party. Montiel and his daughter left Jane's family's apartment the next morning.

A couple of days later, Jane's second-grade teacher and her cheerleading coach both noticed that "something was off" with Jane and asked her what was wrong. Jane

2

told them what Montiel had done, and the adults notified Child Protective Services. Jane's teacher also filed a police report.

A few days after that, a Napa police officer interviewed Jane. During the interview, which was recorded, Jane explained how Montiel had inserted his finger into her vagina. She said the incident was painful and scary.

Several months later, a district attorney investigator interviewed Jane. During the interview, Jane talked about the April 2015 incident and disclosed for the first time that Montiel had smelled his finger afterward. She also reported for the first time an earlier incident in which he had similarly sexually assaulted her while she was staying overnight in his home. Over defense objections, the trial court allowed Jane and the investigator to testify at trial about the earlier incident.

Montiel testified in his own defense. On cross-examination, he claimed to be the "victim of a false allegation," and he denied Jane's accusations. He testified that Jane was "lying" when she said he had put his finger in her vagina, directly touched the skin of her genitals, and pulled down her cheerleading underwear, and he repeated that her testimony at trial was "a lie."

The jury found Montiel guilty of one count of sexual penetration of a child 10 years of age or younger and one count of lewd or lascivious acts with a child under 14 years old.[1] It also found true the allegation that he engaged in substantial sexual conduct with Jane in connection with the latter offense, making him ineligible for probation.[2] The trial court imposed a mandatory sentence of 15 years to life for the first count and the midterm of six years for the second count. It then stayed the sentence for the second

---

[1] The convictions were under Penal Code sections 288.7, subdivision (b) (sexual penetration) and 288, subdivision (a) (lewd or lascivious acts). All further statutory references are to the Penal Code unless otherwise noted.

[2] The allegation was found true under section 1203.066, subdivision (a)(8).

count.[3]  The court also ordered Montiel to pay $50,000 in restitution to Jane and $20,000 in restitution to Jane's mother.

## II.
### DISCUSSION

A.    *Montiel Is Not Entitled to Relief Based on His Trial Counsel's Failure to Object to Expert Testimony About the Rarity of False Reporting in Child Sex-abuse Cases.*

Montiel first contends that his trial counsel was ineffective for not objecting to expert testimony about studies on the frequency of false reporting in child sex-abuse cases, because the testimony constituted improper witness bolstering and exceeded the permissible scope of CSAAS evidence.  We conclude that counsel's failure to object to the admission of the challenged testimony was harmless.

1.    Additional facts.

The prosecution called an expert on CSAAS, Dr. Anthony Urquiza, Ph.D. Dr. Urquiza described how child victims of sexual abuse often manifest the five components of CSAAS:  secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and recantation or retraction.  He explained that children are typically abused by someone with whom they have an ongoing relationship and who is older, larger, more powerful, and more sophisticated.  He also explained why families may belatedly disclose abuse and why victims may act normally around their accusers. Dr. Urquiza explained that CSAAS is not a diagnostic tool for determining whether a child has been abused, and he acknowledged that he did not know the facts in this case and could not render an opinion about them.

Dr. Urquiza also testified about a number of studies showing that child-abuse victims rarely make false allegations.  He stated, "The range of those twelve or so studies is as low as about one percent of the cases that come before law enforcement or C.P.S.

---

[3] The record contains only an indeterminate abstract of judgment, which reflects the conviction for lewd or lascivious acts and the stay but not the term imposed.  The indeterminate abstract of judgment must be amended to omit that conviction and a determinate abstract of judgment must be issued to include it.

are determined to be false allegations, as high as about six or seven percent of those cases are determined to be cases in which [there] is a false allegation. [¶] Probably the best study we have is a Canadian study [in] which they found four percent of cases were determined to be false, so roughly that's the middle of that range of one to about six or seven.  What's interesting in that study is in none of those situations where a false allegation was made was it the child who made allegations that were determined to be false, which leads us to believe that the probably largest subgroup in which false allegations are made appears to be in custodial disputes."  Dr. Urquiza testified that the studies show that false allegations of sexual abuse by children are "very rare, uncommon, it just doesn't happen often."

The trial court gave the following jury instruction based on CALCRIM No. 1193, which addresses testimony on CSAAS:  "You have heard testimony from Dr. Anthony Urquiza regarding child sexual abuse accommodation syndrome. [¶] Dr. Anthony Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Jane's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

        2.     The governing legal standards.

The federal and state Constitutions guarantee criminal defendants the right to adequate representation by counsel.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Doolin* (2009) 45 Cal.4th 390, 458.)  To prevail on a claim of ineffective assistance of counsel, a defendant must show both "that counsel's performance was deficient," such that "counsel was not functioning as the 'counsel' [constitutionally] guaranteed," and "that the deficient performance prejudiced the defense."  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Centeno* (2014) 60 Cal.4th 659, 674.)

To establish the first *Strickland* prong, a defendant must show that "counsel's performance . . . fell below an objective standard of reasonableness under prevailing

5

professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  In evaluating this prong, "a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*Ibid.*)  Because the presumption of counsel's competence can typically be rebutted only with evidence outside the record, a reversal on direct appeal is not warranted unless "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)  Judicial scrutiny of counsel's performance must be "highly deferential" and "consider[] all the circumstances," and the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." (*Strickland*, *supra*, 466 U.S. at pp. 688-689, 696.)

To establish the second *Strickland* prong, a defendant must demonstrate "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694.)  "A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)  "The object of an ineffectiveness claim is not to grade counsel's performance," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland*, at p. 697.)

>           3.      Although the challenged testimony was inadmissible, Montiel fails
>                   to demonstrate that he was prejudiced by his trial counsel's failure to
>                   object to it.

Citing *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, Montiel argues that Dr. Urquiza's false-allegation testimony was inadmissible because it constituted an

expert opinion on the truthfulness of a witness.[4]  *Coffman* pointed out that the "[t]he general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact." (*Coffman,* at p. 82.)  It then concluded that "a psychological expert may not testify about rape trauma syndrome, a condition analogous to battered woman syndrome, in order to prove that a rape actually occurred, although such testimony is admissible to rehabilitate the credibility of the complaining witness against a suggestion that her behavior after the assault—such as a delay in reporting it—was inconsistent with her claim of having been raped." (*Ibid.*, citing *People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248, 251.)

Since Montiel submitted his briefing, Division Four of this court and Division Six of the Second District Court of Appeal have held that similar testimony by Dr. Urquiza "that studies show only a very small percentage of allegations of child sexual abuse are false" was inadmissible.  (*People v. Wilson* (2019) 33 Cal.App.5th 559, 561; accord *People v. Julian* (Apr. 29, 2019, B289613) __ Cal.App.5th __ [pp. 1-2, 5].)  We join our colleagues and conclude that the testimony at issue should not have been admitted, especially since it was offered before Jane's credibility was challenged or needed rehabilitation.  (See *People v. Wells* (2004) 118 Cal.App.4th 179, 188 [CSAAS evidence "must be tailored to address the specific myth or misconception suggested by the evidence"].)  We need not determine whether the failure to object to the testimony rose to the level of ineffective assistance under the first *Strickland* prong, however, because even if we assume it did, the testimony's admission was harmless.

The second *Strickland* prong requires Montiel to show a "demonstrable reality" that if an objection had been made and sustained, it would have made a difference to the

---

[4] Montiel also cites five decisions from appellate courts in other states holding it is improper to admit expert testimony that children who have been sexually abused generally do not lie.  (*Yount v. State* (Tex.Crim.App. 1993) 872 S.W.2d 706, 710-712; *State v. Catsam* (Vt. 1987) 534 A.2d 184, 187; *State v. Lindsey* (Ariz. 1986) 720 P.2d 73, 76; *State v. Myers* (Iowa 1986) 382 N.W.2d 91, 97; *Commonwealth v. Seese* (Pa. 1986) 517 A.2d 920, 922.)

verdicts.  (*People v. Fairbank*, *supra*, 16 Cal.4th at p. 1241.)  He claims that Jane's credibility was the "most important issue at trial" and Dr. Urquiza's testimony "bore heavily on that issue."  We agree that Jane's credibility was important, but the strength of her testimony minimized the impact of the improper bolstering.

In testifying about the charged incident, Jane described sexual behavior with which an eight-year-old child would normally be unfamiliar.  As the prosecutor put it in closing argument, "What eight-year-old would say that an uncle who[m] she had absolutely no problems with, who[m] she had zero motive to falsely implicate, slid[] his finger . . . in and out of her privates where she goes pee, two times?"  And "what eight-year-old little girl would know to invent the fact that the defendant smelled his finger after he put it inside of her genitals?"  Even Montiel's trial counsel acknowledged that Jane was a compelling witness, describing her as a "gregarious . . . little girl . . . [, a]ble to articulate very, very well on the stand."  Furthermore, the jury was instructed that Dr. Urquiza's testimony was "not evidence that [Montiel] committed any of the crimes charged against him," and the prosecutor did not highlight the challenged testimony in closing argument.

This is in stark contrast to the record in *People v. Julian*, where the Court of Appeal concluded that the inadmissible testimony was "highly prejudicial" under the second *Strickland* prong and reversed the convictions.  (*People v. Julian*, *supra*, __ Cal.App.5th __ [pp. 12-13, 16].)  There, the jury was "bombarded" with the statistical evidence, on which the prosecutor relied to "claim that there is a zero percent chance children will fabricate abuse claims," effectively "replac[ing] the presumption of innocence with a presumption of guilt."  (*Id.* at p. 14; cf. *People v. Wilson*, *supra*, 33 Cal.App.5th at p. 572 [error harmless where "Dr. Urquiza's testimony on the statistical evidence was brief"].)  Moreover, unlike in this case, in *Julian* the accusing child's testimony had " 'serious inconsistencies,' " and there was "strong defense

evidence," including testimony by the child's sisters and other witnesses corroborating the defendant's denial of abuse. (*Julian*, at pp. 13-14, italics omitted.)

Given the strength of Jane's testimony and the limited attention given to Dr. Urquiza's testimony about false reporting, we cannot conclude that the testimony mattered much to the jury's determination of Jane's veracity. Accordingly, Montiel has failed to show that he was prejudiced by his trial counsel's failure to object to this testimony, and his ineffective-assistance claim fails. (See *Strickland*, *supra*, 466 U.S. at pp. 688, 694.)

> B. *The Trial Court Properly Exercised Its Discretion in Admitting Evidence of the Prior Incident of Abuse.*

Montiel claims that the trial court erred in admitting evidence of the prior incident of sexual abuse of Jane. We disagree.

The prosecution moved in limine to introduce evidence that "a number of weeks prior to the charged offense[s], when [Jane] was spending the night at [Montiel's] home in Napa, [Montiel] had also put his finger in her vagina." The prosecution argued that this prior conduct was admissible both as evidence of "intent, common plan or scheme, and motive" under Evidence Code section 1101, subdivision (b) (emphasis omitted), and as "propensity evidence" under Evidence Code section 1108 (section 1108). The trial court ruled that the evidence was admissible under both provisions and denied Montiel's request to exclude it under Evidence Code section 352 (section 352).

Montiel does not challenge the evidence's admission under Evidence Code section 1101, subdivision (b), limiting his claim to the trial court's rulings under sections 1108 and 352. We review those rulings for an abuse of discretion. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1104-1105; *People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097.) "We will not find that a court abuses its discretion in admitting such other sexual acts evidence unless its ruling ' "falls outside the bounds of reason." ' " (*Dejourney*, at p. 1105.) In other words, we will not reverse a court's exercise of discretion unless its decision was " ' "arbitrary, capricious, or patently absurd

9

[and] . . . resulted in a manifest miscarriage of justice." ' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286; see also *People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

Section 1108 provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a).) Our state Supreme Court has instructed trial courts that in determining whether to admit evidence of a prior sexual offense under sections 1108 and 352, factors to consider include the prior offense's "nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 916-917 (*Falsetta*).)

Here, no abuse of discretion by the trial court appears. The prior incident involved substantially the same conduct as the charged incident, occurred close in time, and was no more inflammatory than the charged incident. Testimony about the prior incident was not confusing, misleading, or time consuming. Only two witnesses testified about it: Jane and the district attorney investigator. Jane's testimony constitutes only a few pages of the reporter's transcript, and the investigator's testimony constitutes only two pages. The testimony did not significantly stray from the main inquiry of whether Montiel molested Jane on the charged occasion.

Montiel fails to address these *Falsetta* factors. And to support his argument that the prior incident was inadmissible, he relies on cases that are either distinguishable on their facts or were decided before the Legislature enacted section 1108. (See, e.g., *People v. Ewoldt* (1994) 7 Cal.4th 380 [decided before § 1108 enacted]; *People v. Scott* (1978) 21 Cal.3d 284 [same]; *People v. Stanley* (1967) 67 Cal.2d 812 [same]; *People v.*

10

*Harris* (1998) 60 Cal.App.4th 727 [prior acts too inflammatory to be admitted].) We conclude that the trial court did not abuse its discretion in admitting the evidence of the prior incident.[5]

### C. The Trial Court Was Authorized to Award Restitution to Jane's Mother Based on the Psychological Harm She Suffered.

Montiel contends that section 1202.4 did not authorize the trial court to order him to pay victim restitution to Jane's mother (mother) for noneconomic losses. We disagree. In our view, the plain language of section 1202.4 establishes two separate bases—one under subdivision (k)(3) and the other under subdivision (k)(4)—on which parents of children who are sexually abused may qualify as victims in their own right and be awarded restitution for noneconomic losses they sustain.

### 1. Additional facts.

After the verdict, the prosecution sought victim restitution under section 1202.4, subdivision (f)(3)(F) based on noneconomic damages suffered by Jane and mother. As to mother, the prosecution's briefing explained that she had "felt first-hand the effects that this crime had on her and her daughter. In response to supporting her daughter and cooperating with the investigation and prosecution of this case, she and her family have been shunned by their extended family, had to seek psychological counseling, and were ultimately evicted from their home." The prosecution requested $50,000 in restitution to Jane and $20,000 in restitution to mother for the psychological harm they had experienced.

At the sentencing hearing, Montiel objected to the request for victim restitution, stating, "I'm objecting to the non-economic damages in the amount of $70,000. I would argue it is inappropriate in this case, and there's no sufficient factual basis for it. [¶] [The prosecutor] presented statutory authority for . . . the Court to order this $70,000 [in] non-

---

[5] We also reject Montiel's cursory argument that the evidence's admission violated his federal due process rights. (See *People v. Albarran* (2007) 149 Cal.App.4th 214, 229 [admission of evidence does not violate federal due process rights unless " 'there are no permissible inferences the jury may draw from the evidence' " and evidence " ' "necessarily prevents a fair trial" ' "].)

11

economic losses, but I argue there's no basis for it."  The trial court granted the request and awarded $50,000 to Jane and $20,000 to mother "pursuant to . . . section 1202.4[, subdivision ](f)(3)(F), which allows the Court to award restitution for psychological harm."  In doing so, the court found that based on the trial testimony and a letter from mother read at the hearing, it was "clear" that the crime "had a very serious and significant impact on the psychological well-being of Jane Doe and her mother," and the amount of restitution sought for their noneconomic losses was "modest."

The trial court also ordered that Montiel pay restitution to Jane and her family or to the Victim Compensation Board, "in a manner to be determined," based on five claims for financial assistance from the Restitution Fund.  These five claims consisted of a claim on Jane's behalf, for which Jane had already been paid $1,863, and pending claims by mother on her own behalf, by mother on behalf of Jane's siblings, and by Jane's father.

       2.      The award of victim restitution to mother was proper.

We generally review an order of victim restitution for an abuse of discretion. (*People v. Mearns* (2002) 97 Cal.App.4th 493, 498 (*Mearns*).)  The resolution of Montiel's claim, however, hinges on an issue of statutory interpretation, which we review de novo.  (See *People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1084 (*Saint-Amans*).)  " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.'  [Citation.] We begin by examining the statutory language because the words of a statute are generally the most reliable indicator of legislative intent.  [Citations.]  We give the words of the statute their ordinary and usual meaning and view them in their statutory context. . . .  'If the statute's text evinces an unmistakable plain meaning, we need go no further.'  [Citation.]  'Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation.' "  (*In re C.H.* (2011) 53 Cal.4th 94, 100.)  " ' "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' " ' "  (*People v. Loeun* (1997) 17 Cal.4th 1, 9.)

The existence of a constitutional right to restitution also guides our analysis. In adopting section 28 of the California Constitution, the electorate "established a new constitutional right for crime victims to obtain restitution for losses suffered as a result of a criminal act." (*Mearns*, *supra*, 97 Cal.App.4th at p. 498; Cal. Const., art. I, § 28 (section 28).) Section 28 and various statutory provisions were amended by The Victims' Bill of Rights Act of 2008 (also known as "Marsy's Law") to "recognize various rights of victims of crime and of the people of California." (*In re Vicks* (2013) 56 Cal.4th 274, 278, 282.) Given section 28's recognition of an expansive right to restitution, "the courts have held that restitution statutes should be interpreted broadly and liberally." (*Saint-Amans*, *supra*, 131 Cal.App.4th at p. 1084; see *Santos v. Brown* (2015) 238 Cal.App.4th 398, 418 ["Marsy's Law clearly demands a broad interpretation protective of victims' rights"].) "Specifically, this state's Supreme Court has stated that the term 'victim' has a broad and flexible meaning." (*Saint-Amans*, at p. 1084.)

With these standards in mind, we examine the text of section 1202.4. The statute provides that a restitution order "[t]o the extent possible . . . shall identify each victim and each loss . . . and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's conduct, including, but not limited to, all of the following: [¶] . . . [¶] (F) Noneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7."[6] (§ 1202.4, subd. (f)(3).) The plain language of these provisions thus provides that an economic loss includes noneconomic losses for purposes of awarding restitution *for violations*—not just some violations—of the specified child sexual-abuse statutes. Stated another way, under section 1202.4, "restitution orders are limited to [a] victim's economic damages," with the exception of noneconomic losses suffered as a result of the specified crimes. (*People v. Smith* (2011) 198 Cal.App.4th 415, 431.)

---

[6] The references to sections 288.5 and 288.7 were added on January 1, 2018. (Stats. 2018, ch. 101, § 1.)

Neither Montiel nor the dissent disagrees with the general proposition that restitution for noneconomic losses may be awarded for felony violations of section 288. Nor do they point to any statutory language purporting to allow only minor victims to recover restitution for noneconomic losses under section 1202.4, subdivision (f)(3)(F).[7] Instead, they rely on a subsequent subdivision—subdivision (k)—to maintain that mother did not qualify as a "victim" under section 1202.4 who could be awarded restitution for the noneconomic losses she sustained as a result of Montiel's crime. This reliance is misplaced.

Generally, of course, "[a] victim is the *object* of the crime. [Citations.] ' "Actual" ' or ' "direct" ' victims are 'the real and immediate objects' of the offense. [Citation.] Thus, people or entities are entitled to restitution when the crime was committed against them." (*Saint-Amans*, *supra*, 131 Cal.App.4th at p. 1086.) In this sense, Jane, not mother, was the victim because she was the object of Montiel's crime. But section 1202.4 has a much broader definition of victim. It does not limit recovery to actual or direct victims, and it makes clear that parents of children who are sexually abused may be victims in their own right for purposes of being eligible for restitution. Under subdivision (k) of the statute, the term "victim" is defined to also "include all of the following" people[8]:

(1)     The immediate surviving family of the actual victim.

. . .

(3)     A person who has sustained economic loss as the result of a crime and who satisfies any of the following conditions:

(A)     At the time of the crime was the parent, grandparent, sibling, spouse, child, or grandchild of the victim.

[7] In this regard, we note that other provisions of section 1202.4, subdivision (f)(3) authorize restitution for losses suffered by minor victims specifically. (See § 1202.4, subd. (f)(3)(D) & (E).) This suggests the Legislature was capable of limiting restitution for noneconomic losses to child victims of the specified crimes had it chosen to do so.

[8] Section 1202.4, subdivision (k) also includes certain governmental and private entities in the definition of "victim." (See § 1202.4, subd. (k)(2) & (5).)

14

(B)     At the time of the crime was living in the household of the victim.

(C)     At the time of the crime was a person who had previously lived in the household of the victim for a period of not less than two years in a relationship substantially similar to a relationship listed in subparagraph (A).

(D)     Is another family member of the victim, including, but not limited to, the victim's fiancé or fiancée, and who witnessed the crime.

(E)     Is the primary caretaker of a minor victim.

(4)     A person who is eligible to receive assistance from the Restitution Fund pursuant to Chapter 5 (commencing with Section 13950) of Part 4 of Division 3 of Title 2 of the Government Code.

a.     Mother is a "victim" under section 1202.4, subdivision (k)(3).

Throughout this appeal, the parties have focused on whether mother qualifies as a "victim" under section 1202.4, subdivision (k)(3)(A) because of the provision's requirement that the person "sustained economic loss as a result of the crime."[9]  Montiel urges that interpreting "economic loss" to include noneconomic loss would involve "a logic reminiscent of Alice in Wonderland, where up is down and down is up, and words lose their real meaning."  We disagree.  The exact same charge could be leveled at section 1202.4, subdivision (f)(3), and Montiel does not explain how it is any more logical to interpret "economic loss" differently depending on where in section 1202.4 the phrase occurs.  The applicable rules of statutory construction direct us to interpret the phrase consistently.  " 'It is presumed, in the absence of anything in the statute to the contrary, that a repeated phrase or word in a statute is used in the same sense

---

[9] Montiel also argues that mother could not be awarded restitution under section 1202.4, subdivision (k)(1) because she did not qualify as part of "[t]he immediate surviving family of the actual victim," since Jane did not die.  We need not decide whether Montiel's interpretation of the term "surviving" is correct because, as we will explain, mother separately qualified as a "victim" under section 1202.4, subdivision (k)(3) and (4).  (See *People v. O'Neal* (2004) 122 Cal.App.4th 817, 820-821.)

throughout.' " (*People v. Jones* (1988) 46 Cal.3d 585, 595.) Furthermore, we see no reason to interpret the category of victims who sustain economic loss (§ 1202.4, subd. (k)(3)) more narrowly than the category of victims who are entitled to restitution for sustaining economic loss (§ 1202.4, subd. (f)(3)), particularly given our mandate to interpret restitution statutes broadly. The plain language and structure of the section lead to the inexorable conclusion that parents of children who are sexually abused may be awarded restitution for noneconomic losses.

This conclusion is consistent with and furthers the provisions of section 28 of the California Constitution.[10] Section 28, subdivision (b)(13) provides that "[i]n order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled . . . [¶] . . . [¶] . . . [t]o restitution. [¶] (A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer. [¶] (B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." Marsy's Law amended section 28 to define a "victim" as "a person who suffers direct or threatened physical, psychological, or financial harm as a result of the commission or attempted commission of a crime or delinquent act. The term 'victim' also includes the person's spouse, parents, children, siblings, or guardian, and includes a lawful representative of a crime victim who is deceased, a minor, or physically or psychologically incapacitated." (§ 28, subd. (e).) Mother unquestionably qualifies as a victim under this provision. Interpreting

---

[10] After oral argument, we requested and received supplemental briefing from the parties on the impact, if any, of the legislative history of section 1202.4 and Marsy's Law on the statutory analysis. Montiel urged us not to consider legislative history or Marsy's Law because of his view that section 1202.4 is unambiguous. He also took the position that even if section 1202.4 is ambiguous, these extrinsic sources are "not helpful" in interpreting the statute. The Attorney General took the position that the legislative history of section 1202.4 and its precursor, former Government Code section 13967, support the conclusion that mother is entitled to restitution for noneconomic losses.

section 1202.4 to authorize compensation for her noneconomic losses better comports with the constitutional right to restitution as expanded under Marsy's Law.

A decision of the Second District Court of Appeal interpreting Welfare and Institutions Code section 730.6, which governs restitution in delinquency cases, is instructive. (*In re Scott H.* (2013) 221 Cal.App.4th 515, 520.) That statute is similar in several respects to section 1202.4, but it lacks any provision akin to section 1202.4, subdivision (k)(3) that covers family members other than those "surviving" a victim. *Scott H.* relied on the broad constitutional definition of "victim" to hold that despite the lack of explicit statutory authorization, restitution for mental health services to derivative family-member victims was lawful. (*Scott H.*, at pp. 520-522.) The court explained, "The constitutional language must prevail. To the extent the statutory language conflicts with that in the Constitution, the constitutional provision controls." (*Id.* at p. 522.) *Scott H.* bolsters our rejection of Montiel's and the dissent's reading of section 1202.4, subdivision (k)(3), because "a statute must be construed, if reasonably possible, in a manner that avoids a serious constitutional question." (*People v. Engram* (2010) 50 Cal.4th 1131, 1161).

Thus, even if section 1202.4, subdivision (k)(3) can be read to be ambiguous as to whether mother is eligible to be awarded restitution for her noneconomic losses, the meaning of "victim" must be considered in light of section 28's creation of a broad constitutional right to restitution. Not only is it "a 'cardinal principle' of statutory interpretation" that courts should construe an ambiguous statute to avoid doubts about its constitutionality (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373), but courts have also specifically recognized that section 28 requires a liberal interpretation of restitution statutes. Although the dissent makes much of the fact that our interpretation would permit "not just parents, but numerous other persons with far more tangential relationships to the child victim," to recover restitution for noneconomic losses, we hardly think that our decision will open the floodgates to such awards. These losses can only be awarded for violations of the specified child sexual-abuse statutes, and the fact remains that they must be proven to a trial court's satisfaction, a burden that becomes

17

increasingly difficult to sustain as the relationship with the child victim becomes more attenuated.

Finally, we address the dissent's belief that the legislative history of section 1202.4 is determinative and requires us to reverse the trial court's award of restitution to mother. In our view, examining the legislative history is unwarranted given the plain language of the statute. Indeed, Montiel himself agrees that reviewing the legislative history is "not helpful." But even assuming the dissent's description of the legislative history is complete and accurate, we would not read into it what the dissent does.

Nothing in the legislative history, as described by the dissent, evinces any legislative intent to preclude parents of children who are sexually abused from being awarded restitution for their noneconomic losses. The dissent confidently proclaims that subdivision (f)(3)'s inclusion of noneconomic losses as economic losses was merely part of "the Legislature's efforts to streamline this statute," and that the relevant amendment to subdivision (k)(3) was "designed to do one thing—to ensure that the courts could order statutory restitution to any person who received assistance from the [Restitution] Fund, thereby paving the way for the Fund to recoup these amounts directly from the convicted offender." But even if these were the principal purposes of the amendments, they do not "conflict with or contradict our interpretation of the statute." (*Estate of Earley* (2009) 173 Cal.App.4th 369, 376.) "[T]he specific impetus for a bill does not limit its scope when its text speaks to its subject more broadly," and "when the Legislature has made a deliberate choice by selecting broad and unambiguous statutory language, 'it is unimportant that the particular application may not have been contemplated.' " (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 51.) "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 79.) In short, we cannot conclude that the legislative history's silence on whether parents should qualify for awards of restitution for their noneconomic

18

losses negates section 1202.4's plain text and the broad constitutional right to restitution or means that the Legislature intended to prohibit such awards.

        b.      Mother is also a "victim" under section 1202.4, subdivision (k)(4).

Even if mother were ineligible for restitution for her noneconomic losses under section 1202.4, subdivision (k)(3) because of its reference to "economic loss," she is nonetheless eligible for restitution based on subdivision (k)(4), which contains no similar reference. Parents of children who are sexually abused qualify as victims under subdivision (k)(4) so long as they sustained emotional injuries that may result in pecuniary loss compensable from the Restitution Fund.[11]

Under section 1202.4, subdivision (k)(4), "victim" is defined to include "[a] person who is eligible to receive assistance from the Restitution Fund pursuant to Chapter 5 (commencing with Section 13950) of Part 4 of Division 3 of Title 2 of the Government Code." In turn, Government Code section 13955 specifies that "a person shall be eligible for compensation" from the Restitution Fund when he or she timely submits an application, the crime has a tie to California, and several other requirements are met.

These other requirements include the following: First, "[t]he person for whom compensation is being sought" must be "[a] victim" or "[a] derivative victim." (Gov. Code, § 13955, subd. (a)(1)-(2).) For purposes of the specified chapter of the Government Code, " '[v]ictim' means an individual who sustains injury or death as a direct result of a crime." (*Id.*, § 13951, subd. (g).) Second, "the injury or death was a

---

[11] Mother's separate qualification as a "victim" under section 1202.4, subdivision (k)(4) became apparent in considering the supplemental briefing. The record shows that no one in the trial court identified any specific statutory basis for mother's claim (except for the prosecutor's general reference to section 1202.4, subdivision (f)(3)(F)) because there was no need for it: Montiel conceded there was "statutory authority" for awarding restitution for noneconomic losses, and he objected only on the ground that there was "no sufficient factual basis for" the $70,000 award. In the interest of not delaying the resolution of this case any further, we have elected not to ask the parties to submit yet another round of supplemental briefing. If either party wishes to address the application of section 1202.4, subdivision (k)(4), it may petition for rehearing. (Gov. Code, § 68081.)

19

direct result of a crime." (*Id.*, § 13955, subd. (e)(1).) Third, "[a]s a direct result of the crime, the victim or derivative victim sustained one or more of the following: [¶] (1) Physical injury. . . . [¶] (2) Emotional injury and a threat of physical injury. [¶] (3) Emotional injury, where the crime was a violation of . . . [¶] (a) . . . [section 288]." (*Id.*, § 13955, subd. (f)(1)-(3).) And fourth, "[t]he injury or death has resulted or may result in pecuniary loss within the scope of compensation" that may be obtained from the Restitution Fund. (*Id.*, § 13955, subd. (g).)

Because mother is a "victim" under these provisions, we need not decide whether she is also a "derivative victim."[12] For purposes of compensation by the Restitution Fund, "victims" (as opposed to "derivative victims") plainly include people, such as mother, who were not the object of the defendant's crime yet suffered their own injuries as a result. As we have said, under Government Code section 13951, subdivision (g), " '[v]ictim' means an individual who sustains injury or death as a direct result of a crime." In turn, Government Code section 13955 makes clear that "injury" refers to both "physical injury" and "emotional injury," as well as that a "derivative victim" may

---

[12] " '[D]erivative victim' means an individual who sustains pecuniary loss as a result of injury or death to a victim." (Gov. Code, § 13951, subd. (c).) "If compensation is being sought for a derivative victim," an additional requirement applies. (*Id.*, § 13955, subd. (c).) Such a person must be a resident of California and be related to the victim in one of the same five ways that are specified in section 1202.4, subdivision (k)(3), such as by being the victim's parent. Thus, a person who qualifies as a "victim" under section 1202.4, subdivision (k)(3) based on having sustained economic loss and having a particular relationship to the victim is akin to a "derivative victim" who is eligible for compensation through the Restitution Fund.

Based on its conclusion that section 1202.4, subdivision (k)(3) "replicates the definitional language of the state Restitution Fund," the dissent charges us with "adopting a reading of subdivision (k)(4) that effectively reads subdivision (k)(4) out of the statute, as *all* of the persons identified in (k)(3) are 'eligible' for assistance from the Restitution Fund." But it is the dissent's interpretation of section 1202.4, not ours, that renders subdivision (k)(3) surplusage. A "derivative victim" under the Restitution Fund statutes must have sustained a "pecuniary loss"—which is not defined to include noneconomic losses—whereas a "victim" under subdivision (k)(3) must have sustained an "economic loss"—which, as we have explained, *is* defined to include certain noneconomic losses.

20

sustain injury "[a]s a direct result of the crime" even though he or she was not the crime's object. (Gov. Code, § 13955, subd. (f)(1)-(3); see also § 1202.4, subd. (f)(4)(A) ["If, as a result of the defendant's conduct, the Restitution Fund has provided assistance to or on behalf of a victim or derivative victim . . . , the amount of assistance provided shall be presumed to be a direct result of the defendant's criminal conduct"].) Thus, mother sustained a qualifying injury within the meaning of these provisions—emotional injury from a violation of section 288—as a direct result of Montiel's crime. She therefore satisfies the first three of the four additional requirements of eligibility as a victim under Government Code section 13955 that we have discussed.[13]

The fourth and final requirement relevant to mother is that "[t]he injury or death has resulted or may result in pecuniary loss within the scope of compensation" that may be obtained from the Restitution Fund. (Gov. Code, § 13955, subd. (g).) The trial court did not make a finding that mother had sustained a pecuniary loss because it was not asked to award a specific amount in restitution for such loss, but it did order Montiel to pay restitution for any amount ultimately found owing based on Jane and her family's pending claims for assistance from the Restitution Fund. Given mother's pending claim, we have no trouble concluding that the emotional injury she sustained "has resulted or *may result* in pecuniary loss" for which she would be entitled to recovery from the

---

[13] In challenging the conclusion that mother is a victim under the Restitution Fund statutes, the dissent claims that "a 'victim' for purposes of the Restitution Fund is the person against whom, or upon whom, the criminal act is perpetrated, and a 'derivative victim' is a person who, in turn, sustains injury (physical or mental) because of the trauma and injury inflicted upon the victim of the crime." In our view, the dissent's conclusion that the term "victim" refers only to the actual object of a crime is too constricted. The language defining a "victim" as "an individual who sustains injury or death as a direct result of a crime" (Gov. Code, § 13951, subd. (g)) does not exclude people, like mother, whose own physical or emotional injuries were caused by the crime even though they were not the crime's target.

Restitution Fund, such as the cost of mental health services.[14] (Gov. Code, § 13955, subd. (g), italics added; see *id.*, § 13957, subd. (a)(2).) Thus, she qualifies as a "victim" for purposes of section 1202.4 not only under subdivision (k)(3) but also under subdivision (k)(4), because she is eligible for assistance from the Restitution Fund, and the trial court was authorized to award her restitution for her noneconomic losses under subdivision (f)(3)(F).

> D.      *Victim Restitution to Jane and Her Mother Was Proper Even Though the Trial Court Stayed the Sentence for the Section 288 Conviction.*

Finally, Montiel argues that the trial court exceeded its authority in awarding victim restitution based on the conviction of lewd and lascivious acts because the sentence for that conviction was stayed. This argument is meritless because victim restitution is a civil remedy, not punishment precluded by section 654.

Section 654 prohibits punishment "under more than one provision" for "[a]n act or omission that is punishable in different ways by different provisions of law." (§ 654, subd. (a); *People v. Jones* (2012) 54 Cal.4th 350, 355-356.) "[O]ur [state] Supreme Court has established the general rule that section 654 'prohibits the use of a conviction for any punitive purpose if the sentence on that conviction is stayed.' " (*People v. Le* (2006) 136 Cal.App.4th 925, 933, quoting *People v. Pearson* (1986) 42 Cal.3d 351, 361.)

It is true that restitution *fines* are considered punishment and cannot be imposed based on a conviction whose sentence has been stayed. (*People v. Le*, *supra*, 136 Cal.App.4th at p. 934; accord *People v. Sencion* (2012) 211 Cal.App.4th 480, 483;

---

[14] The dissent suggests that the record lacks sufficient documentation of the pending Restitution Fund claims to support an award of restitution based upon them. The claims were set forth in the probation report, however, including claim numbers. In awarding restitution under section 1202.4, "the trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's statement made in the probation report about the value of stolen or damaged property." (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542-1543.) We think that mother's submission of a claim to the Restitution Fund is, at the very least, prima facie evidence that she had or will have a pecuniary loss making her eligible for assistance from the Fund.

22

*People v. Carlson* (2011) 200 Cal.App.4th 695, 710; see *People v. Hanson* (2000) 23 Cal.4th 355, 361 [restitution fines intended as punishment].)  But victim restitution is "enforceable as if the order were a civil judgment" (§ 1202.4, subd. (a)(3)(B)), and courts have concluded in a variety of contexts that it is not punishment.  (See, e.g., *People v. Pangan* (2013) 213 Cal.App.4th 574, 585 [victim restitution not criminal penalty for purposes of right to jury trial on finding increasing sentence beyond statutory maximum]; *People v. Harvest* (2000) 84 Cal.App.4th 641, 645, 650 [victim restitution not punishment for double jeopardy purposes].)  The stay pertained to Montiel's criminal sentence for the conviction under section 288, and we conclude that it did not affect his civil obligation to pay victim restitution under section 1202.4.

In arguing otherwise, Montiel relies on *People v. Zito* (1992) 8 Cal.App.4th 736, which he claims "characterized [victim restitution] as punishment."  In *Zito*, the Sixth District Court of Appeal addressed whether restitution under former Government Code section 13967, which covered both victim restitution and restitution fines, was punishment for purposes of "the rule against ex post facto legislation."  (*Zito*, at pp. 740-741.)  In answering in the affirmative, the court relied on authority establishing that restitution fines are punishment, but it did not provide any analysis as to victim restitution or otherwise distinguish between the two forms of restitution.  (See *id.* at p. 741.)  Thus, even though *Zito* includes the general statement that "restitution constitutes punishment" (*ibid.*), the decision does not support Montiel's position.

## III.
## DISPOSITION

The matter is remanded for the indeterminate abstract of judgment to be amended to omit reference to Montiel's conviction under Penal Code section 288, subdivision (a), and for a determinate abstract of judgment to be issued reflecting that conviction, including the length of the term imposed.  The clerk of the superior court shall forward certified copies of both abstracts of judgment to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

_____

Humes, P.J.

I concur:

_____

Kelly, J.*

*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Montiel*  A150250

24

I join the majority on all issues except restitution for "noneconomic losses" to the child victim's mother (Mother).

Let me make clear at the outset that I entirely agree that if Mother has incurred expenses for counseling or other treatment for emotional trauma due to the sexual assault of her child, she is entitled to assistance from the state Restitution Fund as a "derivative" victim (Gov. Code, §§ 13950, subd. (a), 13951, subd. (c), (e), 13955, subd. (a)(2), (c), (f),[15] 13957, subd. (a)(2)[16]) and also is entitled to statutory restitution for these economic losses as a "victim" as defined by the restitution statute (Pen. Code, § 1202.4, subd. (k)(3)(A)).[17] The majority observes there is a reference in the record to several claims for

---

[15] Government Code section 13955, subdivisions (a)(2) and (c)(1) state in pertinent part: ". . . . [A] person shall be eligible for compensation when all of the following requirements are met: (a) The person for whom compensation is sought is any of the following: [¶] . . . [¶] (2) A derivative victim. [¶] . . . [¶] (c) If compensation is being sought for a derivative victim, the derivative victim is a resident of California, or any other state, who is: . . . [¶] (1) At the time of the crime was the parent, grandparent, sibling, spouse, child, or grandparent of the victim."

[16] Government Code section 13957, subdivision (a)(2) states in relevant part: "(a) The board may grant for pecuniary loss, when the board determines it will best aid the person seeking compensation, as follows: [¶] . . . [¶] (2) Subject to the limitations set forth in Section 13957.2, reimburse the amount of outpatient psychiatric, psychological, or other mental health counseling-related expenses incurred by the victim or derivative victim, including peer counseling services provided by a rape crisis center . . . , and including family psychiatric, psychological, or mental health counseling for the successful treatment of the victim provided to family members of the victim in the presence of the victim, whether or not the family member relationship existed at the time of the crime, that became necessary as a direct result of the crime." The statute sets forth additional limits on assistance for "outpatient mental health counseling" expenses (Gov. Code, § 13957, subd. (a)(2)(A) & (B)), and also allows the board to exceed these limits in "dire or exceptional circumstances." (*Id.*, § 13957, subd. (a)(2)(C).)

[17] Penal Code section 1202.4, subdivision (k) provides in pertinent part:
"(k) For purposes of this section, 'victim' shall include all of the following:
[¶] . . . [¶]
*"(3) A person **who has sustained economic loss** as the result of a crime **and who satisfies any of the following** conditions:*

1

assistance having been submitted to the Restitution Fund.  It acknowledges, however, neither a copy of these claims, nor any information as to the kind and amount of assistance they request, are in the record.  A sentencing court cannot, of course, order statutory restitution without at least some showing as to the nature and amount of loss. (See *In re Travis J.* (2013) 222 Cal.App.4th 187, 204 [no "evidence in the record" supported claimed economic loss]; *People v. Harvest* (2000) 84 Cal.App.4th 641, 653 [claim for burial expenses not supported with documentation or testimony; while "mention" of such claim in probation report provided notice to defendant of a potential claim, that did not "take the place of evidence"].[18])  In any case, since assistance from the Restitution Fund is limited to economic losses, the claims presumably seek assistance for such losses, which I agree are compensable losses recoverable through statutory restitution.  The issue before us, however, concerns restitution for noneconomic losses.

The majority recognizes Mother cannot receive assistance from the state Restitution Fund for noneconomic losses.  (Gov. Code, §§ 13950, subd. (a), 13957, subd. (a).)  It concludes, however, that she is entitled to restitution for such loss under the "plain language" of the restitution statute.  I do not agree the plain language secures such

---

"(A) *At the time of the crime was the parent*, grandparent, sibling, spouse, child, or grandchild of the victim.
"(B) At the time of the crime was living in the household of the victim.
"(C) At the time of the crime was a person who had previously lived in the household of the victim for a period of not less than two years in a relationship substantially similar to a relationship listed in subparagraph (A).
"(D) Is another family member of the victim, including, but not limited to, the victim's fiancé or fiancée, and who witnessed the crime.
"(E) Is the primary caretaker of a minor victim.
"(4) *A person who is eligible to receive assistance from the Restitution Fund* pursuant to Chapter 5 (commencing with Section 13950) of Part 4 of Division 3 of Title 2 of the Government Code."  (Pen. Code, § 1202.4, subd. (k)(3)(A)–(E), (4), italics and boldface added.)

[18]  The majority also notes a victim's own valuation of property set forth in a probation report can support restitution of such economic loss.  (Maj. opn., at p. 11, fn. 8.)  Here, however, the probation report does not specify either the nature, or the amount, of the loss for which assistance has been sought from the Restitution Fund.

entitlement. Moreover, in my view, the statutory language and legislative history of the provisions with which we are concerned show otherwise. While the majority cites to article I, section 28 of the California Constitution as bolstering its reading of the restitution statute, I do not agree that its amendment through what is commonly known as "Marsy's Law" overturned the state's long-standing law on restitution, and particularly the well-established principle that restitution is generally limited to economic losses.

Thus, while I agree that our restitution statutes are to be liberally construed,[19] in my view it is telling that no case has ever considered, let alone endorsed, the majority's view that noneconomic loss can be relabeled as economic loss and thereby awarded as statutory restitution. Indeed, under the majority's construction, not just parents, but numerous other persons with far more tangential relationships to the child victim, can recover emotional distress damages as statutory restitution in child molestation cases—a result that far exceeds the bounds of recovery of such noneconomic losses even in civil suits based on sexual assault crimes. Accordingly, for reasons I now explain, I conclude there is no basis for restitution for noneconomic loss to Mother.

***Statutory Restitution***

The majority implicitly acknowledges that if one looks first to the definition of "victim" set forth in subdivision (k)(3) of section 1202.4 of the Penal Code, Mother does not come within any of the enumerated categories, as she has not sustained "economic loss" as that term is commonly understood and as it has been applied in restitution cases. (Pen. Code, § 1202.4, subd. (k)(3)(A); see, e.g., *People v. Lehman* (2016) 247 Cal.App.4th 795, 801–802 [discussing "economic" and "noneconomic" losses]; *People v. Smith* (2011) 198 Cal.App.4th 415, 431 (*Smith*) [same]; *People v. Fulton* (2003) 109 Cal.App.4th 876, 883–884 (*Fulton*) [same].)

---

[19] The principle of liberal construction has been articulated and developed in cases involving differing forms of economic loss. (E.g., *People v. Keichler* (2005) 129 Cal.App.4th 1039, 1046–1047 [costs incurred in traditional Hmong healing ceremonies].)

The majority therefore looks to another subdivision of the statute, specifically Penal Code section 1202.4, subdivision (f)(3), which lists, nonexclusively, categories of losses for which a convicted offender must make restitution. (*People v. Giordano* (2007) 42 Cal.4th 644, 656 (*Giordano*) ["[s]ince its amendment in 1996, the list of categories of compensable loss in Penal Code section 1202.4 has been nonexclusive"].) As the majority observes, all of the listed categories are forms of economic loss, with the exception of Penal Code section 1202.4, subdivision (f)(3) category (F). At the time defendant committed his offenses, category (F) required restitution for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Sections 288" (lewd or lascivious acts involving children). (Stats. 2012, ch. 873, § 1.) The subdivision has since been amended to also expressly include violations of Penal Code sections 288.5 (continuous sexual abuse of a child) and 288.7 (sexual acts with a child 10 years old or younger)—an amendment that "clarify[ed] existing law." (*People v. Lee* (2018) 24 Cal.App.5th 50, 60.)

The majority concludes that the "noneconomic losses" for which restitution must be made in felony child molestation cases under category (F) are, in fact, "economic losses" for purposes of Penal Code section 1202.4. It reaches this conclusion despite the fact category (F) expressly uses the terminology "noneconomic losses," and despite the fact the courts, including the Supreme Court, have repeatedly declared category (F) is an "exception" to the general rule that restitution is limited to "economic losses." (*Giordano, supra*, 42 Cal.4th at p. 656; see *People v. McCarthy* (2016) 244 Cal.App.4th 1096, 1099 (*McCarthy*) ["direct victim restitution is generally limited to economic losses"; Pen. Code, § 1202.4, subd. (f)(3)(F) "creates an exception to this general limitation"]; *Fulton, supra*, 109 Cal.App.4th at p. 884, fn. 5 [Legislature "made an express policy determination that noneconomic damages are not recoverable as restitution," "the sole exception" being "the Legislature's determination that noneconomic losses would be recoverable" in felony Penal Code section 288 cases]; *Smith, supra*, 198 Cal.App.4th at p. 431 [with "one exception, restitution orders are

4

limited to the victim's economic damages"; the "exception is for '[n]oneconomic losses . . . for felony violations of Section 288' "].)

The majority arrives at this conclusion by way of the language in Penal Code section 1202.4, subdivision (f)(3) that precedes the nonexclusive list of losses for which restitution must be made. This language instructs sentencing courts to order restitution "of a dollar amount . . . sufficient to fully reimburse the victim or victims for every determined economic loss incurred . . . including, but not limited to, all of the following" enumerated categories. (Pen. Code, § 1202.4, subd (f)(3).) By virtue of this prefatory language, the majority concludes "[t]he plain language of these provisions thus provides that an economic loss includes noneconomic losses for purposes of awarding restitution *for violations*—not just some violations—of the specified child sexual-abuse statutes."[20] (Maj. opn., at p. 12.)

Armed with its conclusion that the "noneconomic losses" for which restitution must be made under Penal Code section 1202.4, subdivision (f)(3) category (F) are actually "economic losses" for purposes of this particular statute, the majority returns to the statutory definition of "victim" and concludes Mother is a "person who has sustained *economic loss* as the result of a crime" (Pen. Code, § 1202.4, subd. (k)(3)(A))—because she sought restitution for the "noneconomic losses" compensable under Penal Code section 1202.4, subdivision (f)(3)(F), which according to the majority are, uniquely for purposes of this statute, "economic losses."

In my view, the majority has effectively rewritten the statute and excised both the explicit "noneconomic loss" language out of Penal Code section 1202.4 subdivision (f)(3)(F) and the explicit "economic loss" language out of the statutory definition of "victim" in subdivision (k)(3), and in doing so, has disregarded the Legislature's intent

---

[20] While the majority appears to view the fact category (F) speaks in terms of "violations" as significant and supporting its view that the "plain language" of the statute allows not only child victims, but also parents (and other adults identified in Pen. Code, § 1202.4, subd. (k)(3)) to recover restitution for noneconomic losses, I fail to see how this is so, given that the "violations" referenced by category (F) are for *child* molestation.

both in authorizing restitution for noneconomic losses in felony child molestation cases and in expanding the statutory definition of "victim" to include numerous persons, including parents, who have sustained economic loss.

The statutory language with which we are concerned has its genesis in former Government Code section 13967, subdivision (c). That subdivision was enacted in 1986 "to plug the gap that remained after 1983, when . . . the Legislature attempted to comply with the [then newly enacted] constitutional mandate that it enact legislation requiring restitution in every criminal case." (*People v. Broussard* (1993) 5 Cal.4th 1067, 1075 (*Broussard*).) While the Legislature had enacted statutory provisions applicable to offenders granted probation, it had not enacted provisions applicable to those denied probation. Subdivision (c) of former Government Code section 13967 corrected that oversight.[21] (*Broussard*, at pp. 1073–1074.)

As of 1990, former Government Code section 13967, subdivision (c) provided, in relevant part:

> "In cases in which a victim has suffered economic loss as a result of the defendant's criminal conduct, and the defendant is denied probation, . . . the court shall order restitution to be paid to the victim. . . . A restitution order imposed pursuant to this subdivision shall identify all losses to which it pertains. . . . [¶] Restitution ordered pursuant to this subdivision shall, to the extent possible, be of a dollar amount that is sufficient to fully reimburse the victim, or victims, *for all determined economic losses incurred as the result of the defendant's conduct.*" (Former Gov. Code, § 13967, subd. (c), Stats. 1990, ch. 45, § 2, italics added.)

Thus, by 1990, the restitution statute contained language directing sentencing courts to fully reimburse victims for "all determined economic losses" (Stats. 1990,

---

[21] Why the Legislature placed these provisions in the Government Code, rather than in the Penal Code, is unclear. The restitution statute pertaining to offenders granted probation was codified in the Penal Code (former Pen. Code, § 1203.4), as was the statute requiring felons to pay a restitution fine (Pen. Code, § 1202.4, Stats. 1990, ch. 45, § 2). (See *Broussard, supra*, 5 Cal.4th at p. 1073.) The other Government Code provisions associated with the new legislation pertained to the state Restitution Fund (formerly called the Victims of Crime Program). (See *id.*, at pp. 1072–1074.)

ch. 45, § 2)—language nearly identical to the language the majority now states makes "plain" that "economic loss" for purposes of Penal Code section 1202.4 "includes noneconomic losses for purposes of awarding restitution" in felony child molestation cases. (Maj. opn., at p. 12.) Government Code section 13967, subdivision (c), however, contained no exemplar categories of compensable loss, let alone, a category of "noneconomic loss." Nor did the statute contain, at this juncture, any definition of "victim."[22]

The following year, in 1991, the Legislature amended former Government Code section 13967, subdivision (c) to read as follows:

> "In cases in which a victim has suffered economic loss as a result of the defendant's criminal conduct, and the defendant is denied probation, . . . the court shall order restitution to be paid to the victim. *If a defendant has been convicted of a felony violation of Section 288 of the Penal Code, restitution to the victim may be ordered whether or not the defendant is denied probation.* Notwithstanding subdivision (a) [pertaining to a restitution fine], restitution shall be imposed in the amount of the losses, as determined. . . . A restitution order imposed pursuant to this subdivision shall identify the losses to which it pertains. . . . [¶] Restitution ordered pursuant to this subdivision shall, to the extent possible, be of a dollar amount that is sufficient to fully reimburse the victim, or victims, for all determined economic losses incurred as the result of the defendant's conduct. *If the conviction is for felony violation of Section 288 of the Penal Code, the court may also order that the restitution be paid to the victim to cover noneconomic losses, including, but not limited to, psychological harm.*" (Former Gov. Code, § 13967, subd. (c), Stats. 1991, ch. 657, § 1, italics added.)

Thus, it was at this point, that the authorization for restitution of "noneconomic losses" in felony child molestation cases was added to the restitution statute applicable to offenders denied probation. As a result, the statute now contained language directing sentencing courts to fully reimburse victims for "all determined economic losses" *and* language authorizing restitution for "noneconomic losses" in felony child molestation

---

[22] "Victim" was defined in the statute requiring restitution by offenders granted probation, as follows: "For purposes of this section, 'victim' shall include the immediate surviving family of the actual victim in homicide cases." (Former Pen. Code, §1203.04, subd. (a)(1), Stats. 1990, ch. 45, § 5.)

7

cases. The Legislature clearly did *not* equate the two—as the directive to order restitution for "all determined economic losses" and the authorization to also order restitution for "noneconomic losses" in felony child molestation cases, were set forth in two separate sentences. Rather, what seems plain to me is that the Legislature employed the terms "economic losses" and "noneconomic losses" in accordance with their usual and customary meaning.

The statute still remained without a definition of the term "victim." (Stats. 1991, ch. 657, § 1.) However, as the Supreme Court discussed in *People v. Birkett* (1999) 21 Cal.4th 226 (*Birkett*), by this time, the term had a well-established meaning in the restitution context—" '[a] "victim" is a "person who is the *object* of a crime." ' " (*Id.* at p. 232, quoting *People v. Crow* (1993) 6 Cal.4th 952, 957.)

Given this legal landscape, the legislative history of the new provision authorizing restitution for "noneconomic losses" in felony child molestation cases is highly informative as to the Legislature's intent in adding this singular exception to the general rule that restitution is limited to economic losses. (See *People v. Scott* (2014) 58 Cal.4th 1415, 1424 ["Legislature ' "is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof." ' "].)

The legislation, Senate Bill No. 736 (1991–1992 Reg. Sess.), started out as an effort to parlay the holding in *J.C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009 (*J.C. Penney*), into a statutory requirement that courts take judicial notice of felony convictions and use such a conviction to establish a "presumption" that the offender acted " 'intentionally,' " thereby foreclosing coverage under any general liability insurance policy insuring the wrongdoer. (Sen. Bill No. 736 (1991–1992 Reg. Sess.) as introduced Mar. 6, 1991; Sen. Com. on Judiciary Rep., com. on Sen. Bill No. 736 (1991–1992 Reg. Sess.) May 7, 1991, pp. 2–3.) *J.C. Penney* dealt specifically with a felony Penal Code section 288 conviction and foreclosed the use of liability insurance proceeds as compensation, holding that "insurers are not required to indemnify their insureds for damages caused by an insured's sexual molestation of a child." (*J.C. Penney*, at p. 1014.) The proponents of the legislation claimed the courts were repeatedly having to try the

8

issue of "intentional" wrong in civil cases in which crime victims sought to recover damages from offenders. (Sen. Com. on Judiciary Rep., com. on Sen. Bill No. 736 (1991–1992 Reg. Sess.) May 7, 19991, pp. 2–3.)

After concerns were raised about the legality of mandating such "presumptions," the legislation was retooled to focus on providing the *minor child* victims of molesters with additional sources of compensation. The Senate Committee on Judiciary Report explained: "In lieu of making insurance benefits available to victims of an insured's criminal conduct, proponents instead propose several other ideas to compensate *the* victim for the injuries." (Sen. Com. on Judiciary Rep., com. on Sen. Bill No. 736 (1991–1992 Reg. Sess.), May 21, 1991, p. 4, italics added.) These were: (1) "[i]nvading the homestead exemption of the defendant"; (2) "[i]ncreasing State assistance to *child victims* of sexual abuse"; and (3) "[i]ncreasing restitution payments to *the child molestation victim* to also cover psychological damages and noneconomic losses." (*Id.*, at pp. 4–5, italics added, underscoring omitted.)

Thereafter, the amended legislation focused on two means of providing compensation to the child victims of these crimes—increasing state Restitution Fund assistance to the "*child victim* of sexual assault" and empowering sentencing courts "to require the convicted defendant in a child molestation case to pay restitution to *the* victim which would cover non-economic losses, including psychological harm." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 736 (1991–1992 Reg. Sess.), May 30, 1991, pp. 1–2, italics added; see Board of Control, analysis of Sen. Bill No. 736 (1991–1992 Reg. Sess.) as amended May 30, 1991, p. 1 [bill "would increase the maximum Victim of Crime Program [] reimbursement to *minor victims* of sexual assault," and "would also provide that a court may order a convicted child molester to pay restitution, including compensation for noneconomic losses, to *the* victim," italics added]; Assem. Ways and Means Com., analysis of Sen. Bill No. 736 (1991–1992 Reg. Sess.) as amended Aug. 20, 1991, p. 1 ["bill would increase the maximum award from the Board of Control's Victims of Crimes program . . . for uncompensated costs . . . *for minors who are victims of sexual assault*," italics added];

9

Assem. Ways and Means Com., Republican Caucus analysis of Sen. Bill No. 736 (1991–1992 Reg. Sess.) Aug. 21, 1991, p. 1 ["The purpose of this bill is to increase compensation *to child victims* of sexual assault from Board of Control by ordering increased restitution payments by the defendant."].)

The enrolled bill report prepared by the Office of Criminal Justice Planning thus summarized the features of the bill, in pertinent part, as follows:  "*Child victims* of sexual assault would be positively impacted by allowing them to receive compensation for damages not currently covered. . . .  [The bill] would raise the amount of state assistance in paying for ongoing treatment. . . .  Finally, the court would be allowed to order restitution to *the* victim for not only pecuniary losses, but also for non-economic losses This bill could possibly assist the *child victim* of sexual assault by opening a variety of avenues of compensation for damages, both economic and non-economic."  (Off. Criminal Justice Planning, Enrolled Bill Rep., Sen. Bill No. 736 (1991–1992 Reg. Sess.) as amended Aug. 28, 1991, pp. 1–2, italics added.)

The amended bill also increased the dollar amount of assistance the state Restitution Fund could provide to persons eligible to receive assistance from the Fund. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 736 (1991–1992 Reg. Sess.), May 30, 1991, p. 1.)  The Restitution Fund, as pointed out, provides assistance to both direct and "derivative" victims (Gov. Code, §§ 13951, subd. (c), 13955, subd. (a)(1) & (2)) for specified economic losses.  (Gov. Code, §§ 13950, subd. (a), 13951, subd. (e), 13957, subd. (a).)  The enrolled bill report prepared by the Office of Criminal Justice Planning thus explained the legislation additionally "would raise the amount of state assistance in paying for ongoing treatment.  This is significant in that it allows for the *victim and their family* to receive the kind of extensive ongoing therapy often times required in the recovery process of this particular victimization."  (Off. of Criminal Justice Planning, Enrolled Bill Rep., Sen. Bill No. 736 (1991–1992 Reg. Sess.) as amended Aug. 28, 1991, pp. 1–2, italics added.)

Thus, it seems apparent from the legislative history, particularly given the well-established meaning of the term "victim" in the case law, that the Legislature's

authorization for statutory restitution for "noneconomic losses" in felony child molestation cases was intended to provide recompense to the persons who are the objects of such crimes—the *child victims*.[23]  (See *Birkett, supra*, 21 Cal.4th at p. 232.)

There is no suggestion in either the statutory language as enacted, or in the legislative history, that persons other than the child victim could recover restitution for such "noneconomic losses."  Rather, it seems clear the Legislature contemplated that persons other than the child victim, such as the victim's family, would benefit from other provisions of the legislation that increased the levels of state Restitution Fund assistance for economic losses, such as the expenses of counseling or on-going therapy.

The next relevant amendments to former Government Code section 13967, subdivision (c), occurred in 1994.  At this point, Government Code section 13967, subdivision (c) was eliminated, and former section 13967 was reduced to a single paragraph pertaining solely to the state Restitution Fund.  (Stats. 1994, ch. 1106, § 2.)  The substance of Government Code section 13967, subdivision (c) was moved into Penal Code section 1202.4, which, until this juncture, pertained to restitution fines and also allowed restitution to be stayed when imposed as a condition of probation (former Pen. Code, § 1202.4, Stats. 1990, ch. 45, § 4).  (See Stats. 1994, ch. 1106, § 3; State and Consumer Services Agency Enrolled Bill Rep., Assem. Bill No. 3169 (1993–1994 Reg. Sess.) p. 1 ["bill would move the provisions for imposition of restitution fines and restitution orders from the Government Code to the Penal Code"].)

With respect to restitution, Penal Code section 1202.4 now provided in pertinent part:

---

[23]  In *People v. Martinez*, the Court of Appeal discussed the legislative history of the 1991 amendments to former Government Code section 13976, subdivision (c) in some detail, concluding restitution for "noneconomic losses" was not limited to felony "section 288" cases, as it showed the Legislature's intent was to authorize such restitution to "child molest victims" in " 'child molestation' " cases, which include Penal Code section 288.5 and 288.7 cases.  (*People v. Martinez* (2017) 8 Cal.App.5th 298, 306–307.)

11

"(f)  In every case in which a victim has suffered economic loss as a result of the defendant's conduct, and the defendant is denied probation, . . . the court shall require that the defendant make restitution to the victim or victims. . . .

"(g)  Restitution ordered pursuant to subdivision (f) shall be imposed in the amount of the losses, as determined. . . .  Restitution shall, to the extent possible, be of a dollar amount that is sufficient to fully reimburse the victim or victims, *for every determined economic loss incurred as the result of the defendant's criminal conduct, including all of the following*:
> (1)  Full or partial payment for the value of stolen or damaged property. The value . . . shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible.
> (2)  Medical expenses.
> (3)  Wages or profits lost due to injury incurred by the victim, and if the victim is a minor, wages or profits lost by the minor's parent, parents, guardian, or guardians, while caring for the injured minor.
> (4)  Wages or profits lost by the victim, and if the victim is a minor, wages or profits lost by the minor's parent, parents, guardian, or guardians due to time spent as a witness or in assisting the police or prosecution. [¶] . . . [¶]

*"(i)  If the conviction is for felony violation of Section 288, restitution may be ordered pursuant to subdivision (f) regardless of whether or not the defendant is denied probation and the court may order that the restitution be paid to the victim to cover noneconomic losses, including, but not limited to, psychological harm.* [¶] . . . [¶]

"(k)  For purposes of this section, 'victim' shall include the immediate surviving family of the actual victim. [¶] . . . [¶]

"(p)  Nothing in this section shall prevent a court from ordering restitution to any corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a direct victim of a crime."  (Stats. 1994, ch. 1106, § 3, italics added.)

Thus, like former Government Code section 13967, subdivision (c), Penal Code section 1202.4 now contained language directing sentencing courts to fully reimburse victims for their "determined economic loss[es]," with the additional proviso, "including all of the following" preceding four newly enumerated categories of loss.  (See State and Consumer Services Agency Enrolled Bill Rep., Assem. Bill No. 3169 (1993–1994 Reg.

12

Sess.) p. 2 ["bill would clarify types of losses to be reimbursed by direct restitution"].)
And, like former Government Code section 13967, subdivision (c), Penal Code section
1202.4 now contained language authorizing restitution for "noneconomic losses" in
felony child molestation cases. As in former Government Code section 13967,
subdivision (c), it is also apparent the Legislature, in Penal Code section 1202.4, did not
conflate the "economic losses" for which restitution was required in all cases and the
"noneconomic losses" for which restitution could also be required in felony child
molestation cases. On the contrary, the directive that sentencing courts order restitution
for all "economic losses," and the authority to also order restitution for "noneconomic
losses" in felony child molestation cases, were placed in different subdivisions.
Accordingly, in my view, the plain language of the statute continued to reflect that the
Legislature employed the terms "economic losses" and "noneconomic losses" in
accordance with their usual and customary meaning.

One additional subdivision in the newly expanded statute is also pertinent to the
issue before us. New Penal Code section 1202.4, subdivision (k) defined "victim" as
follows: "For purposes of this section, 'victim' shall include the immediate surviving
family of the actual victim." (Stats. 1994, ch. 1106, § 3.) This reflects that the
Legislature understood that, without further definitional language, the term "victim" had
the meaning developed in the case law, i.e., the person who was the object of the crime.
(See *Birkett, supra*, 21 Cal.4th at pp. 232–233, 236–243 [canvassing history of term
"victim" in case law and restitution statutes].) It further reflects that by including
"immediate surviving family" as "victims," the Legislature aligned this restitutionary
statute with the statute requiring restitution by offenders granted probation (former Pen.
Code, § 1203.04, subd. (a)(1), Stats. 1990, ch. 45, § 5).

The Legislature made no further changes to the statutory provisions with which we
are concerned until 1996. As then amended by Senate Bill No. 1685 (1995–1996 Reg.
Sess.), Penal Code section 1202.4 provided in pertinent part:

> "(f) In every case in which a victim has suffered economic loss as a result of the
> defendant's conduct, the court shall require that the defendant make restitution to

13

the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . .  The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so. . . . [¶] . . . [¶]

(3)  To the extent possible, the restitution order shall be prepared by the sentencing court, shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims *for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to the following*:

(A)  Full or partial payment for the value of stolen or damaged property. The value . . . shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible.

(B)  Medical expenses.

(C)  Wages or profits lost due to injury incurred by the victim, and if the victim is a minor, wages or profits lost by the minor's parent, parents, guardian, or guardians, while caring for the injured minor.

(D)  Wages or profits lost by the victim, and if the victim is a minor, wages or profits lost by the minor's parent, parents, guardian, or guardians, due to time spent as a witness or in assisting the police or prosecution.

*(E)  Noneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288.*

(F)  Interest, at the rate of 10 percent per annum, that accrues as of the date of sentencing or loss, as determined by the court.

(G)  Actual and reasonable attorney's fees and other costs of collection accrued by a private entity on behalf of the victim.

"(g)  The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record.  A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution order, nor shall inability to pay be a consideration in determining the amount of a restitution order. [¶] . . . [¶]

"(k)  For purposes of this section, 'victim' shall include the immediate surviving family of the actual victim.  'Victim' shall also include any corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a direct victim of a crime."  (Stats. 1996, ch. 629, § 3, italics added.)

Thus, it was at this point, that the authorization for restitution for "noneconomic losses" in felony child molestation cases moved from a separate subdivision into the list of exemplar compensable losses.

14

In my view, it too greatly strains the Legislature's efforts to streamline this statute to say, as the majority does, that despite continuing to use the same language it had used in all preceding versions of the statute, and despite continuing to use the express terminology "noneconomic losses" in connection with felony child molestation cases, the Legislature suddenly redefined these "noneconomic losses" as "economic losses" for purposes of this particular statute, and did so, moreover, without any language that *actually says* the "noneconomic losses" compensable in felony child molestation cases are, for purposes of this particular statute, "economic losses."

Given the history of these statutory provisions, as well as the legislative history of Senate Bill No. 1685 (1995–1996 Reg. Sess.) specifically, it seems far more plausible to me that the Legislature folded the authorization for restitution for "noneconomic losses" in felony child molestation cases (that had previously been set forth in Pen. Code, § 1202.4, subd. (i)) into the growing list of compensable losses (that had previously been set forth in subdivision (g) and now appeared in new Pen. Code, § 1202.4, subd. (f)(3)), for the same reason it consolidated the two formerly separate provisions pertaining to the definition of "victim" (that had appeared in Pen. Code, § 1202.4, subds. (k) & (p))— namely, in an effort to tighten the statute.

Nothing in the legislative history of Senate Bill No. 1685 (1995–1996 Reg. Sess.) supports the view that in creating a new subdivision to contain the ever burgeoning list of compensable losses and moving the authorization for restitution of "noneconomic losses" in felony child molestation cases from a separate subdivision into that list, the Legislature, despite retaining the express terminology "economic loss" and "noneconomic loss," intended to redefine these "noneconomic losses" as "economic losses" for purposes of this particular statute. Yet, this is the lynchpin of the majority's assertion that the "plain language" of the statute "provides that an economic loss includes noneconomic losses" in felony child molestation cases. (Maj. opn., at p. 12.)

The list of categories of compensable economic losses previously set forth in Penal Code section 1202.4, subdivision (g), was not moved into a new subdivision (Pen. Code. § 1202.4, subd. (f)(3)) until the third round of amendments to the legislation. At

15

the same time, two new categories of compensable loss were added—"[i]nterest . . . that accrues as of the date of sentencing or loss, as determined by the court" (designated at that point as new category (F)) and "[a]ctual and reasonable attorney's fees and other costs of collection" (designated at that point as new category (G)).  These two new additional categories of compensable loss were pointed out in floor analyses and committee reports.  (E.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1685 (1995–1996 Reg. Sess.) as amended May 7, 1996, p. 3 ["[i]nterest on economic losses is also added to the list of items to be included in determining restitution"]; Assem. Com. on Public Safety Rep., bill analysis on Sen. Bill No. 1685 (1995–1996 Reg. Sess.) July 2, 1996, p. 4 ["[t]his bill adds various provisions relative to the imposition of restitution orders, including the following:  specify that a restitution order is to include 10% interest to accrue per annum, attorney's fees and other costs relating to the collection of restitution obligations"].)

The authorization for restitution of "noneconomic losses" in felony child molestation cases previously set forth in Penal Code section 1202.4, subdivision (i), was not folded into the expanded list of compensable losses until the fourth, and next to last, round of amendments to the legislation.  (Sen. Bill No. 1685 (1995–1996 Reg. Sess.) as amended June 27, 1996.)  Floor analyses and committee reports continued to refer *only* to the new categories of loss, namely interest, and attorney fees and costs incurred in collecting restitution.  (E.g., Sen. Rules Com. Rep. on Unfinished Business, Sen. Bill. No. 1685 (1995–1996 Reg. Sess.) Aug. 5, 1996, p. 3. ["bill requires that courts impose a specific dollar amount of restitution . . . and the courts may include interest, attorney's fees and costs"]; Assem. Com. on Public Safety Rep., bill analysis on Sen. Bill No. 1685 (1995–1996 Reg. Sess.) Aug. 5, 1996, p. 1 ["[d]efines 'losses' for purposes of a restitution order as including interest at the rate of 10% per annum that accrues as of the date of sentencing or loss, as determined by the court, and attorney's fees and other costs of collection accrued by a private entity on behalf of the victim"].)  *No mention*, in any floor analysis or committee report, was made of the relocation of the language authorizing restitution expressly for "noneconomic losses" in felony child molestation

16

cases, into the expanded list of compensable losses now set forth in newly created Penal Code section 1202.4 subdivision (f)(3).**24**

The only mention of the elimination of former Penal Code section 1202.4, subdivision (i) appears in a memo prepared for the bill's author by staff of staff suggestions of "possible" additional amendments "to clarify the intent of the Legislature and to remove redundancy and unnecessary language." (Jim Ho, memo to Quentin Kopp, author of Sen. Bill No. 1685 (1995–1996 Reg. Sess.) June 14, 1996, pp. 2–3.) These staff suggestions also included combining former Penal Code section 1202.4, subdivision (k) and former subdivision (p) into a single subdivision defining "victim." (*Ibid.*) Both the relocation of the "noneconomic loss" provisions of former Penal Code section 1202.4 subdivision (i) into new subdivision (f)(3)(E), and the relocation of the "victim" provisions of former subdivision (p) into subdivision (k), occurred shortly after the date of this staff memo. (Sen. Bill No. 1685 (1995–1996 Reg. Sess.) as amended June 27, 1996.) There is not the faintest indication that the reshuffling and consolidation of the statutory language that temporally followed this memo wrought the profound substantive change in the meaning of this statutory language, that the majority claims, and did so,

---

**24** In *McCarthy, supra*, 244 Cal.App.4th at pp. 1106–1107, the Court of Appeal observed that when the Legislature moved the substance of former Penal Code section 1202.4, subdivision (i) into new subdivision (f)(3), it changed the wording somewhat and eliminated the word " 'conviction' " and, instead, used the term " 'violations' " of section 288. The court found "no explanation for this specific change" in the legislative history. (*McCarthy*, at p. 1107.) However, applying rules of statutory construction, the court concluded the change from "conviction" to "violation" must have had some significance, and posited it reflected an intent "to remove any requirement that defendants actually be convicted of a charge under section 288 before restitution for noneconomic losses could be awarded." (*Ibid.*) The court therefore concluded that restitution for "noneconomic losses" was also allowable where the defendant, although convicted of a felony child molestation offense under another statute, engaged in conduct that also violated Penal Code section 288. (*McCarthy,* at pp. 1099, 1108–1109.) As noted above, the Court of Appeal in *People v. Martinez, supra*, 8 Cal.App.5th at pp. 306–307, reached the same conclusion, but did so by examining the legislative history of the 1991 legislation that first added the language authorizing restitution of "noneconomic losses" in felony child molestation cases.

moreover, without so much as a passing reference in any floor analysis or committee report.

The Legislature continued to amend Penal Code section 1202.4, but only amendments in 1999 and 2004 are germane to the issue before us.

The 1999 amendments, among other things, further expanded the nonexclusive list of categories of compensable losses set forth in Penal Code section 1202.4, subdivision (f)(3). With this amendment, the authorization for restitution of "noneconomic losses" in felony child molestation cases appeared as category (F), rather than as category (E), because "[m]ental health counseling expenses" was added as a new category of compensable loss. (Stats. 1999, ch. 584, § 4.)

The more significant 1999 amendment, for our purposes, was the expansion of the definition of "victim" in Penal Code section 1202.4, subdivision (k) to include "derivative" victims, as defined for purposes of the state Restitution Fund, so that the subdivision read as follows:

> "(k)  For purposes of this section, 'victim' shall include all of the following:
> "(1)  The immediate surviving family of the actual victim.
> "(2)  Any corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a direct victim of a crime.
> *"(3)  'Derivative victims' as defined in Section 13960 of the Government Code."*
> (Stats. 1999, ch. 584, § 4, italics added.)

Since the state Restitution Fund provides assistance solely for economic loss (Gov. Code, § 13950, subd. (a)), the Legislature, by expressly incorporating this Restitution Fund definition, added a category of individuals sustaining *economic* loss. (*Id*., § 13951, subd. (c) [" 'Derivative victim' means an individual who sustains pecuniary loss as a result of injury or death to a victim."].)[25]

---

[25] "Derivative victim" was further defined for purposes of the state Restitution Fund as follows:

> "(2)  'Derivative victim' means a resident of California who is one of the following:

In 2004, the Legislature made this even more explicit by further amending the definition of "victim" in Penal Code section 1202.4, subdivision (k)(3) to read as follows and as it does in pertinent part today:

> "(k)  For purposes of this section, 'victim' shall include all of the following:
> "(1)  The immediate surviving family of the actual victim.
> "(2)  Any corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a direct victim of a crime.
> "(3)  Any person *who has sustained economic loss* as the result of a crime *and who satisfies any of the following* conditions:
> "(A)  At the time of the crime *was the parent*, grandparent, sibling, spouse, child, or grandchild of the victim.
> "(B)  At the time of the crime was living in the household of the victim.
> "(C)  At the time of the crime was a person who had previously lived in the household of the victim for a period of not less than two years in a relationship substantially similar to a relationship listed in subparagraph (A).
> "(D)  Is another family member of the victim, including, but not limited to, the victim's fiancé or fiancée, and who witnessed the crime.
> "(E)  Is the primary caretaker of a minor victim.
> "(4)  Any person who is eligible to receive assistance from the Restitution Fund pursuant to Chapter 5 (commencing with Section 13950) of Part 4 of Division 3 of Title 2 of the Government Code."  (Former Pen. Code, § 1202.4, subd. (k)(1)–(4), Stats. 2004, ch. 223, § 2, italics added; see Pen. Code, § 1202.4, subd. (k)(1)–(4).)

The language added to Penal Code section 1202.4, subdivision (k)(3) could not, in my view, be any plainer.  Subdivision (k) states that it defines victim "[f]or purposes of

---

> "(A)  At the time of the crime was the parent, sibling, spouse, or child of the victim.
> "(B)  At the time of the crime was living in the household of the victim.
> "(C)  A person who had previously lived in the household of the victim for a period of not less than two years in a relationship substantially similar to a relationship listed in subparagraph (A).
> "(D)  Is another family member of the victim, including the victim's fiancé, and witnessed the crime.
> "(E)  Is the primary caretaker of a minor victim, but was not the primary caretaker at the time of the crime."  (Former Gov. Code, § 13960, subd. (a)(2)(A)–(e), Stats. 1998, ch. 697, § 1; see Gov. Code, § 13955, subd. (c)).)

19

this section."[26]  (Pen. Code, § 1202.4, subd. (k).)  Penal Code section 1202.4, subdivision (k)(3), in turn, expressly limits the five categories of persons it embraces to persons who have "*sustained economic loss* as the result of a crime."  (Italics added.)  Indeed, in replacing the general reference to "derivative victims" with these five enumerated categories of persons, the Legislature *replicated* in the restitution statute the state Restitution Fund's more specific definition of "derivative victims."  (See ante, fn. 10; see also Gov. Code, § 13955, subd. (c).)  The Legislature thus aligned the victim definitional provisions of Penal Code section 1202.4, subdivision (k)(3) with the "derivative victim" definitional provisions of the state Restitution Fund.

The legislative history makes this abundantly clear.  The legislation was sponsored by the state Restitution Fund (Sen. Appropriations Comm. Fiscal summary, Sen. Bill No. 631, as amended Apr. 30, 2003, p. 1), and its purpose was "*to recoup more restitution for the Restitution Fund.*"  (Sen. Com. on Public Safety, Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended Apr. 30, 2003, p. 1; see, e.g., Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading of Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended Apr. 30, 2003, p. 1 [bill makes a number of changes to Penal Code "in order to recoup more restitution fines for the Restitution Fund"]; Assem. Com. on Public Safety, Sen. Bill No. 631 (2003–2004 Reg. Sess.) July 1, 2008, as amended Apr. 30, 2003, p. 1 [bill makes "various changes" to Penal Code "in order to recoup more restitution fines and increase

---

[26] Thus, I find the majority's criticism of "rely[ing]" on this "subsequent" subdivision (maj. opn., at p. 13) baffling.  That the Legislature placed the definition of "victim" for purposes of the statute in Penal Code section 1202.4, subdivision (k), rather than in a subdivision preceding the list of compensable losses set forth in subdivision (f)(3), cannot mean, as the majority seems to suggest, that one should not look first at this express definition in determining whether a person is a "victim" for purposes of statutory restitution.  (See, e.g., *People v. Runyan* (2012) 54 Cal.4th 849, 864 (*Runyan*) [Penal Code "[s]ection 1202.4 limits eligibility for mandatory restitution to carefully defined crime 'victims' (*id*., subd. (k)," and looking to the definition to conclude estate of deceased victim is not a "victim" for purposes of statutory restitution]; *Giordano, supra*, 42 Cal.4th at pp. 656–657 [looking to definition to conclude decedent's wife was a "victim" for purposes of statutory restitution].)

20

revenue to the Restitution Fund"]; Assem. Com. on Appropriations, Sen. Bill No. 631 (2003–2004 Reg. Sess.) Aug. 20, 2003, as amended Aug. 18, 2003 [same].)

Committee reports explained the Fund was suffering a severe "structural imbalance" from increased assistance to crime victims, resulting in a dire need for additional resources. The bill was, thus, intended to "strengthen the Board's ability to collect revenue" and would "make clarifying and technical changes to existing law" to achieve that end. (Sen. Com. on Public Safety, Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended Apr. 30, 2003, p. 4; see, e.g., Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading of Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended Apr. 30, 2003, p. 5 ["bill will strengthen the Board's ability to collect revenue and make clarifying and technical changes to existing law"]; Assem. Com. on Public Safety, Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended Apr. 30, 2003, pp. 4–9 [same and chronicling legislation expanding Restitution Fund's authority to reimburse victims, including expanding the definition of "derivative" victim, and expanding reimbursement of pecuniary losses suffered by sexual assault victims].)

Notably, the legislative history repeatedly described the "[e]xisting law" pertaining to the definition of "victim" by summarizing and citing the Government Code provisions *pertaining to the state Restitution Fund*. (E.g., Sen. Com. on Public Safety, Sen. Bill No. 631 (2003–2004 Reg. Sess.) May 6, 2003, as amended Apr. 30, 2003, p. 2;[27] Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading of Sen. Bill No. 631 (2003–

---

[27] For example, the Senate Committee on Public Safety stated: "Existing law provides for the reimbursement of victims—both direct victims and specified derivative victims—of specified types of crimes for specified types of expenses with limits on those expenses (both dollar amounts and time limits on treatment). Included are expenses for outpatient psychiatric, psychological, or other mental health counseling related expenses that became necessary as a direct result of the crime. These counseling services may only be reimbursed if provided by specified individuals. Payments may also be made to private nonprofit agencies and for rape crisis center peer counseling. (Government Code § 13957.) [¶] Existing law states that 'derivative victim' means an individual who sustains pecuniary loss as a result of injury or death to a victim. (Government Code § 13951(c).) [¶] Existing law provides that if compensation is being sought for a derivative victim, the derivative victim is a resident of California, or resident of another

21

2004 Reg. Sess.) as amended Apr. 30, 2003, pp. 2–3; Assem. Com. on Public Safety, Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended Apr. 30, 2003, p. 3.)

The expansion of Penal Code section 1202.4, subdivision (k)(3) so that it replicates the definitional language of the state Restitution Fund was, thus, designed to do one thing—to ensure that the courts could order statutory restitution to any person who received assistance from the Fund, thereby paving the way for the Fund to recoup these amounts directly from the convicted offender. (E.g., Dept. of Finance Bill Analysis, Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended Mar. 30, 2004, p. 1 [bill would "Clarify that victims, including 'derivative victims' who are eligible for compensation from the Board are also entitled to specified criminal restitution orders"].) The Legislative Counsel thus explained the purpose of the amendments to Penal Code section 1202.4, subdivision (k) as follows: "This bill would delete the language that adds 'derivative victims' to the definition of 'victims' for purposes of adult restitution fines and orders, and instead add specified persons *who have sustained economic loss* as the result of a crime, and persons eligible for awards to victims of crime to those deemed 'victims' for these purposes." (Stats. 2004, ch. 223, Dig., subd. (4), italics added.)

Because the Restitution Fund is authorized to provide assistance *only* for economic loss, the only crime victims through which the Fund can recoup reimbursement from convicted offenders, are victims who have sustained economic loss. It therefore makes abundant sense that the expanded victim definitional provisions added to Penal Code section 1202.4, subdivision (k)(3) at the behest of the Restitution Fund—to enhance the Fund's ability *to obtain reimbursement*—focus on, and are limited to, enumerated persons who have suffered *economic loss*.

Neither the statutory language nor the legislative history remotely suggests that, despite explicitly stating Penal Code section 1202.4, subdivision (k)(3) is limited, as a

state, who is any of the following: (1) At the time of the crime was the parent, grandparent, sibling, child, or grandchild of the victim . . . . (Government Code, § 13955(c).)" (Sen. Com. on Public Safety, Sen. Bill No. 631 (2003–2004 Reg. Sess.) May 6, 2003, as amended Apr. 30, 2003, p. 2.)

threshold matter, to a "person who has sustained economic loss," the Legislature actually meant "a person who has sustained either economic loss or has sustained 'noneconomic loss' in a case where the defendant has committed felony child molestation"—as the majority reads the statute. The Legislature, of course, could have included such language in Penal Code section 1202.4, subdivision (k)(3), since the authorization for restitution for "noneconomic losses" in felony child molestation cases had, by then, been part of section 1202.4 for more than a decade. The Legislature did not, however, include such language. Nor is that surprising, given the Legislature's purpose in amending the subdivision—to ensure that the *Restitution Fund* has the ability to recoup through statutory restitution, assistance it provides to crime victims for *economic losses*.

The majority does not disagree that in amending Penal Code section 1202.4, subdivision (k)(3) the Legislature replicated the Restitution Fund's definition of "derivative victim." Nor does it disagree that the Legislature's stated purpose in doing so was to ensure that the Restitution Fund can recoup directly from convicted offenders the assistance it provides victims for economic losses. The majority asserts, however, that while this may have been the " 'specific impetus' " for the legislation, that intent is " ' "unimportant" ' " given what it views as " 'broad and unambiguous statutory language' " authorizing Mother to recover restitution for noneconomic losses. (Maj. opn., at p. 17.) Thus, the majority states, it "cannot conclude that the legislative history's silence on whether parents should qualify for awards of restitution for their noneconomic losses negates [Penal Code] section 1202.4's plain text and the broad constitutional right to restitution or means that the Legislature intended to prohibit such awards." (Maj. opn., at p. 18.)

In my view, the "plain" text of the statute says no such thing. Nor, in my view, is the legislative history silent. Rather, the legislative history seems quite clear—and shows that the Legislature authorized restitution for noneconomic losses in felony child molestation cases to afford child victims an additional avenue (besides a civil suit) to obtain redress for their emotional distress damages, and has addressed the emotional needs of other family members through expanded assistance from the state Restitution

Fund and correlative expansion of statutory restitution to ensure that it is convicted offenders who ultimately bear the cost of this assistance.[28]

The majority goes on to state that even if Mother is not a "victim" under Penal Code section 1202.4, subdivision (k)(3) given its "reference" to "economic loss," she is nevertheless a "victim" under subdivision (k)(4). (Maj. opn., at p. 18.) That subdivision defines "victim" as, "Any person who is eligible to receive assistance from the Restitution Fund pursuant to Chapter 5 (commencing with Section 13950) of Part 4 of Division 3 of Title 2 of the Government Code." (Pen. Code, § 1202.4, subd. (k)(4).) The majority concludes that "[p]arents of children who are sexually abused qualify as victims under subdivision (k)(4) so long as they sustained emotional distress injuries that may result in pecuniary loss compensable from the Restitution Fund." (Maj. opn., at p. 18.)

Again, I completely agree that a parent who has sustained pecuniary loss for which the Restitution Fund can provide assistance is entitled to statutory restitution for such economic loss. Indeed, Penal Code section 1202.4, subdivision (k)(4) was also added to the statute in 1994, along with subdivision (k)(3), at the request of the Restitution Fund to ensure that it can recoup directly from convicted offenders the assistance it provides to crime victims. (E.g., Dept. of Finance Bill Analysis, Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended Mar. 30, 2004, p. 1 [bill is "intended to assist the Board with Restitution Fund revenue collections" and, among other things, will "[c]larify that victims, including 'derivative victims' who are eligible for compensation from the Board are also entitled to specified criminal restitution orders"]; Assem. Com. on Public Safety, Sen. Bill No. 631 (2003–2004 Reg. Sess.) as amended April 30, 2003, p. 1 [amendments

---

[28] Indeed, the majority's repeated response to the extensive—and I believe highly illuminating—legislative history is that it is immaterial because the statutory language "plainly" and "unambiguously" entitles Mother to restitution for noneconomic losses. I cannot share this view, given the "plain" language of both the definition of "victim" in Penal Code section 1202.4, subdivision (k)(3) requiring "economic loss" and the authorization for restitution of "noneconomic losses" in child molestation cases, which the majority reads as constituting "economic losses" for purposes of this particular statute.

are being made "in order to recoup more restitution fines and increase revenue to the Restitution Fund," and the bill "[s]pecifically . . .[¶] . . . [¶] 4) clarifies that the VCP [the Fund] can be reimbursed from restitution fines for payments to all categories of derivative victims, as specified, and any other person eligible to receive benefits from the Restitution Fund"].) Given the stated purpose of this subdivision, I do not see how it can be read as defining "victim" to include persons who sustain *non*economic loss, as the Restitution Fund does not provide assistance for such losses and, thus, it cannot seek reimbursement of such through statutory restitution.[29]

Moreover, the majority has looked to Penal Code section 1202.4, subdivision (k)(4) in order to disregard the express language of the definitional provision that pertains *specifically* to parents and other enumerated persons. In other words, the majority is adopting a reading of subdivision (k)(4) that effectively reads subdivision (k)(3) out of the statute, as *all* of the persons identified in (k)(3) are "eligible" for assistance from the Restitution Fund (indeed, that subdivision replicates the "derivative" victim definitional language in the Restitution Fund statutes (see Gov. Code, § 13955, subd. (c)(1)–(5)) and, thus, under the majority's construction, these persons also come within (k)(4)—rendering subdivision (k)(3) superfluous. It is a fundamental maxim of statutory interpretation,

---

[29] The inclusion of Penal Code section 1202.4, subdivision (k)(4), in addition to subdivision (k)(3), was also necessary to ensure that *all* persons or entities entitled to receive assistance from the Restitution Fund can recover statutory restitution, thereby ensuring the Fund's ability to be reimbursed directly from convicted offenders. As discussed, subdivision (k)(3) replicates the Fund's elaborated definition of "derivative victim." The direct "victim," of course, can also receive assistance from the Fund, as can a person "who is entitled to reimbursement for funeral, burial, or crime scene cleanup expenses." (Gov. Code, § 13955, subd. (a)(1)–(3).) The victim of the crime is not among the persons enumerated in Penal Code section 1202.4, subdivision (k)(3). Nor is a person who bears funeral or burial, or cleanup, expenses necessarily among the persons enumerated in subdivision (k)(3). Penal Code section 1202.4, subdivision (k)(4), however, ensures that these latter persons or entities can also recover statutory restitution and the Restitution Fund, in turn, can be reimbursed for such assistance. Subdivision (k)(4) also ensures that, should the Legislature further expand who can receive assistance from the Fund, those persons or entities will also be eligible for statutory restitution, enabling the Fund to seek reimbursement.

however, that "every part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary," and it certainly is not absolutely necessary in this case.[30] (*People v. Arias* (2008) 45 Cal.4th 169, 180.)

In addition, in contending that Mother is a "victim" in "her own right" as defined by the Restitution Fund statutes, and therefore the definition of "derivative victim" in the Restitution Fund statutes (and its reference to economic loss) can be ignored, the majority overlooks that the fundamental requirement for *any* person seeking assistance from the Restitution Fund—whether denominated a "victim," "derivative victim," or otherwise— is economic loss. Absent economic loss, *no* assistance can be provided by the Fund. (Gov. Code, §§ 13950, subd. (a), 13951, subds. (c) & (e), 13957, subd. (a).) Thus, the fact that the Restitution Fund statutes define "injury" to either a "victim" or "derivative victim" as including physical and emotional injury (*id*., § 13955, subd. (f)) is not the salient point. Rather, what is significant is that *any* person seeking assistance from the Fund must have sustained economic loss as a result of those injuries. Thus, in my view, the majority's attempt to craft from the Restitution Fund statutes, a definition of "victim"

---

[30] The majority states its interpretation of Penal Code section 1202.4, subdivision (k)(4) does not effectively render subdivision (k)(3) a nullity. While acknowledging that Penal Code section 1202.4, subd. (k)(3)(A)–(E) employs the same definitional language that appears in the Restitution Fund statutes pertaining to "derivative victims" (Gov. Code, § 13955, subd. (c)(1)–(5)), it notes that the Restitution Fund statutes also generally define "derivative victim" as a person who "sustains pecuniary loss as a result of injury or death to a victim" (*id*., § 13951, subd. (c)), whereas Penal Code section 1202.4, subdivision (k)(3) requires that these persons have "sustained economic loss as the result of a crime." The majority then reiterates its conclusion that by virtue of the prefatory language of Penal Code section 1202.4, subdivision (f)(3), "an 'economic loss' . . . *is* defined [for purposes of Penal Code section 1202.4] to include certain noneconomic losses." (Maj. opn., at p. 19, fn. 12.) To begin with, the majority overlooks that the Restitution Fund statues also expressly define "pecuniary loss" as "an economic loss or expense" (Gov. Code, § 13951, subd. (e)), so I fail to see how the choice of terminology, "pecuniary loss" or "economic loss," has any significance. It is also apparent that the majority's alternative reliance on the definition of victim in Penal Code section 1202.4, subdivision (k)(4), like its reading of subdivision (k)(3), is ultimately grounded on its view that, uniquely for purposes of this statute, "noneconomic loss" actually means "economic loss," a view I cannot share.

26

for purposes of the Restitution Fund that does not include economic loss, wholly misses the forest for the trees.

Finally, in focusing minutely on the definition of "victim" in the Restitution Fund statutes, the majority overlooks numerous other statutory provisions that, in my view, make it clear that a "victim" for purposes of the Restitution Fund is the person against whom, or upon whom, the criminal act is perpetrated, and a "derivative victim" is a person who, in turn, sustains injury (physical or mental) because of the trauma and injury inflicted upon the victim of the crime.  (E.g., Gov. Code, §§ 13955, subd. (c)(1) [derivative victim includes "parent, grandparent, sibling, spouse, child, or grandchild of *the* victim," italics added]; 13957, subd. (a)(2) [authorizing reimbursement for "counseling for the successful treatment of *the* victim provided to family members of *the* victim in the presence of *the* victim," italics added], *id*., subd. (a)(2)(B)(i) [specifying circumstances in which assistance to derivative victim is limited to counseling "necessary for the treatment of *the* victim"]; Cal. Code Regs. tit. 2, § 649.7, subd. (a)(3) [applicant who is not "*the actual* victim or derivative victim," must identify basis for request], *id*., subd. (a)(8) ["*the* victim, the victim's survivors, or the derivative victim" must state whether he or she intends to file a civil lawsuit], italics added; *id*., § 649.13 [requirements for certain derivative victims who lived in "*the* victim's household"], italics added.[31])

This is also the way in which prior cases have referred to persons seeking assistance from the Restitution Fund and persons requesting statutory restitution.  (E.g., *In re Scott H.* (2013) 221 Cal.App.4th 515, 520–524 (*Scott H.*)  [for statutory restitution purposes, referring to minor victim's parents as "derivative victims"]; *Cano v. State Bd. of Control* (1992) 7 Cal.App.4th 1162, 1163–1164 [for Restitution Fund purposes,

---

[31] Even the materials published by the Restitution Fund to assist individuals in applying for assistance, in my view, make clear that the "victim" is the person against whom the crime is perpetrated and "derivative victims" are those who, in turn, sustain loss as a result of the injury and trauma inflicted on the victim.  (California Victim Compensation Board, CalVCM FAQ:  Eligibility <https://victims.ca.gov/victims/faq/eligibility.aspx#Who> [as of May 7, 2019].)

referring to person who was murdered as the "direct victim" of the crime, and to his sister, who sought assistance for her own mental health costs, as a "derivative victim"].)

For all of these reasons, I cannot agree Mother "separately qualifies" as a "victim" in "her own right" for purposes of the Restitution Fund (maj. opn. at p. 19, fn. 12) and therefore Penal Code section 1202.4, subdivision (k)(4) can be read as dispensing with the "economic loss" requirement of subdivision (k)(3).

It is not just the statutory language and its legislative history that convince me the majority's interpretation of Penal Code section 1202.4 is untenable. Under the majority's reasoning, persons in *all five categories* of Penal Code section 1202.4, subdivision (k)(3) can seek restitution for noneconomic losses in a felony child molestation case. That means any of the following persons could recover emotional distress damages based on criminal conduct directed at, and injury inflicted on, the child victim—parents, grandparents, and siblings (Pen. Code, § 1202.4, subd. (k)(3)(A)), a person living in the household at the time of the crime (*id*., subd. (k)(3)(B)), a person who had previously lived in the household of the victim for a period of not less than two years in a relationship substantially similar to that of a parent, grandparent, or sibling (*id*., subd. (k)(3)(C)), a person who is another family member of the victim and who witnessed the crime (*id*., subd. (k)(3)(D)), and a primary caretaker of the minor victim (*id*., subd. (k)(3)(E)). There is not the faintest suggestion in either the language of the statute or the legislative history, and particularly the legislative history of the provision authorizing restitution for noneconomic losses in child molestation cases, that the Legislature intended that anyone "living in the household," for example, can seek restitution for such noneconomic losses. Thus, while the majority repeatedly states it sees no reason why the "parents" of child molestation victims should not recover for their own emotional distress, the reasoning it employs is by no means limited to parents.[32]

---

[32] The majority does not dispute that its analysis extends to all such persons, but dismisses this because such persons would have to show they suffered distress and sentencing courts can ably distinguish between legitimate and far-fetched claims of emotional distress. (Maj. opn., pp. 16–17.) But that does not obscure the fundamental

28

Furthermore, as discussed above, the Legislature authorized restitution for "noneconomic losses" in felony child molestation cases to provide child victims with an additional means, besides a civil lawsuit, to recover emotional distress damages. (Off. of Criminal Justice Planning, Enrolled Bill Rep., Sen. Bill No. 736 (1991–1992 Reg. Sess.) as amended Aug. 28, 1991, pp. 1–2.; cf. *Runyan, supra*, 54 Cal.4th at p. 865 ["the primary purpose of mandatory restitution, as of civil damage recovery, is reimbursement for the economic loss and disruption caused to the crime victim"].) The California courts have consistently refused, however, to allow the recovery of emotional distress damages based solely on the "foreseeability" of emotional distress to third parties. Rather, the courts have allowed the recovery of emotional distress only in the following circumstances: (a) in cases of intentional and outrageous conduct, *if* the wrongful conduct was "directed at the plaintiff" or occurred "in the presence of a plaintiff of whom the defendant is aware" (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903; *id*. at pp. 902–905 [defendant's mishandling of remains, while egregious, was not "directed at" surviving family members]), and (b) in cases of negligence, *if* the plaintiff was a " 'bystander' " and observed the defendant's wrongful conduct, or if the plaintiff was a " 'direct victim' " of the defendant's wrongful conduct (*Huggins v. Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 126–127, 129–130 (*Huggins*) [parents were not " 'direct victim[s]' " of pharmacist's negligence in filling child's prescription]; *Thing v. La Chusa* (1989) 48 Cal.3d 644, 667–669 [mother who did not see accident involving her child could not recover emotional distress damages as "bystander"]).

These limitations apply in sexual assault cases. In *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583 (*Marlene F.*), for example, the Supreme Court considered whether two mothers could recover emotional distress

---

problem with the majority's analysis—that it allows all such persons to seek restitution for noneconomic losses and puts the criminal courts to the task of considering such emotional distress claims. This cannot be what the Legislature intended either in authorizing restitution for noneconomic losses in child molestation cases or in adding the derivative victim provisions to the definition of "victim."

damages based on the molestation of their children by a therapist. The court concluded the mothers could recover as "direct victims" of the molester because they "explicitly and expressly alleged" that *they*, as well as their children, "were patients of the therapist." (*Id.* at p. 590.) "In other words, the counselling was not directed simply at each mother and son as individuals, but to both in the context of the family relationship." (*Ibid.*) Thus, the therapist's "abuse of the therapeutic relationship and molestation of the boys breached his duty of care to the mothers as well as to the children." (*Id.* at p. 591.) The court closed by "repeating that *the mothers here were the patients* of the therapist along with their sons, and the therapist's tortious conduct was accordingly directed against both." (*Ibid.,* italics added; see *Huggins, supra*, 6 Cal.4th at p. 131 ["[i]t was only because the parents in . . . *Marlene F., . . .* qualified as the *patients* of the defendant caregivers that they could recover emotional distress as the defendants' direct victims"].)

Subsequent Court of Appeal decisions, in turn, have refused to allow the recovery of emotional distress damages in the absence of the predicate requirements laid down by our Supreme Court, including in cases where family members sought emotional distress damages based on the molestation or sexual assault of another family member. (See, e.g., *Steven F. v. Anaheim Union High School Dist.* (2003) 112 Cal.App.4th 904, 906, 911 [parents could not recover emotional distress damages against school district for teacher's sexual relationship with their daughter]; *Ess v. Eskaton Properties, Inc.* (2002) 97 Cal.App.4th 120, 127–131 [sister could not recover emotional distress damages against care facility as either "bystander" or "direct victim" based on sexual molestation of her sister while a patient in the facility]; *Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 838–840 [sister could not recover emotional distress damages against church as "bystander" or "direct victim" based on the molestation of her brother].)

As the majority construes Penal Code section 1202.4, however, the plaintiff family members in every one of these cases, as well as persons with far more attenuated relationships with the child victim, would be entitled to recover these same emotional distress damages in the form of statutory restitution. Nothing in the language of Penal

30

Code section 1202.4, or its legislative history, remotely suggests that the Legislature intended the expansive recovery of emotional distress damages through the criminal courts that the majority's construction allows. This additional difficulty with the majority's construction of the restitution statute is, of course, eliminated if one respects the express "noneconomic loss" language of Penal Code section 1202.4, subdivision (f)(3)(F) and heeds the express "economic loss" requirement of subdivision (k)(3).

*Constitutional Right to Restitution*

The majority also cites to "Marsy's Law" as support for its reading of Penal Code section 1202.4, but I do not perceive anything in this amendment to article I, section 28, of our state constitution that does so.

The right of crime victims to restitution from convicted offenders was added to our state constitution in 1982, when "California voters passed Proposition 8, also known as The Victims' Bill of Rights. At the time this initiative was passed, victims had some access to compensation through the [state] Restitution Fund, and trial courts had discretion to impose restitution as a condition of probation." (*Giordano, supra*, 42 Cal.4th at p. 652.) "Proposition 8 established the right of crime victims to receive restitution directly 'from the persons convicted of the crimes for losses they suffer' " and added "article I, section 28, subdivision (b) to the California Constitution." (*Giordano*, at p. 652.)

As enacted, article I, section 28, subdivision (b) provided: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer. Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary." (Former Cal. Const., art. I, § 28, subd. (b).)

This new constitutional provision was not self-executing and directed the Legislature to adopt implementing legislation. (*People v. Martinez* (2017) 2 Cal.5th 1093, 1100, fn. 1.) Not surprisingly, the Legislature's efforts resulted in a number of

31

restitution cases finding their way to the high court. Three of the cases discussing article I, section 28, subdivision (b) of the California Constitution, as originally enacted, bear mention.

In *Broussard*, the court considered whether the Legislature could authorize sentencing courts to order restitution to victims who suffered economic loss but not physical injury. (*Broussard, supra*, 5 Cal.4th at p. 1069.) Historically, some statutes, and specifically those pertaining to the state Restitution Fund, authorized restitution where the victim sustained injury or death. (*Id.* at p. 1072.) However, the new constitutional right to restitution, as the high court explained, broadly stated " 'all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer.' " (*Id.* at p. 1073, quoting Cal. Const., art. I, § 28, subd. (b).) The Legislature's efforts to implement this mandate, in turn, were replete with expressions of intent to empower sentencing courts to order restitution for "economic losses" regardless of any physical injury. (*Broussard,* at pp. 1073–1074, italics omitted.) The court therefore had little difficulty concluding the Legislature "intended the word 'victim,' as used in subdivision (c) of [former Government Code] section 13967, to include anyone who has not suffered physical injury but *has sustained economic loss* resulting from a defendant's criminal acts." (*Id.* at p. 1075, italics added.)

In *Birkett*, the high court considered whether insurance carriers that had reimbursed crime victims for losses resulting from the theft of their vehicles were entitled to statutory restitution. (*Birkett, supra*, 21 Cal.4th at pp. 229–230.) The trial court and Court of Appeal concluded the insurers had "assumed the status of direct victims" and were therefore entitled to restitution. (*Id.,* at p. 230.) The Supreme Court reversed.

In concluding the insurers had no right to statutory restitution, the court exhaustively discussed article I, section 28, subdivision (b) of the California Constitution and the array of statutes implementing it. (*Birkett, supra*, 21 Cal.4th at pp. 231–242.) In 1994, when the defendant committed his offenses, former Penal Code section 1203.04 governed restitution by offenders granted probation (as the defendant had been) and required restitution to "victims" except in an exceptional case. (*Id.* at pp. 230–231.) The

32

statute further specified this mandate did not preclude restitution to an entity that was " 'a direct victim of a crime.' " (*Id.* at p. 231, italics omitted*.*)

The court first observed that "in the context of the restitution statutes," " '[a] "victim" is a "person who is the *object* of a crime." ' " (*Birkett, supra*, 21 Cal.4th at p. 232, quoting *People v. Crow, supra*, 6 Cal.4th at p. 957.) The court further observed that, since its enactment in 1983, former Penal Code section 1203.04 had never defined "victim," "except to note that ' "victim" shall include the immediate surviving family of the actual victim in homicide cases.' " (*Birkett,* at pp. 234–235.) Thus, in the years preceding the 1994 iteration of the statute, the appellate courts had issued conflicting opinions as to whether "indirect" victims were entitled to restitution, and the Supreme Court had granted review in a number of cases to decide the issue. (*Id.* at pp. 239–240.)

Before it could do so, the Legislature amended the restitution statutes again. The court concluded that by consistently using the term "victim," rather than "person," in its most recent legislative efforts, the Legislature made it clear it intended to limit restitution to *direct* victims. (*Birkett, supra*, 21 Cal.4th at pp. 240–241; *id*. at pp. 241–242 [by specifying restitution was "confined to 'actual' and 'direct' 'victim[s]' rather than all 'persons[s]' who had incurred crime-related losses, the 1994 Legislature clearly sought to resolve the uncertainties" as to whether indirect victims were entitled to statutory restitution].)

The Supreme Court recognized that cogent policy arguments could be made for extending the right to restitution to any person or entity sustaining economic loss as a result of a defendant's criminal conduct. (*Birkett, supra*, 21 Cal.4th at p. 242.) But, said the court, the Legislature had made a policy choice "to grant only 'direct' crime victims and their immediate [surviving] families a right to restitution . . . and otherwise to foreclose such entitlement by persons whose losses arose only as a result of crimes committed against others." (*Id.* at p. 243.)

The court then circled back to the language of the Constitution, which broadly declared that " 'all persons who suffer losses as a result of criminal activity' " are entitled to restitution. (*Birkett, supra*, 21 Cal.4th at p. 243.) Given "the generality" of this

33

language, and the fact the voter materials had repeatedly used the term "victim," the court concluded the electorate had not been concerned "with anything other than victims as ordinarily understood, i.e., those against whom crimes had been committed." (*Ibid.*) It was also "well settled," said the court, "that when the Legislature is charged with implementing an unclear constitutional provision, the Legislature's interpretation of the measure deserves great deference." (*Id.* at p. 244.) And "[i]n limiting" the right to restitution "to 'direct victim[s]' of crime, the Legislature [had] adopted a plausible interpretation of the constitutional provision." (*Ibid.*)

In *Giordano*, the Supreme Court considered the extent to which the deceased victim's wife was entitled to statutory restitution. (*Giordano, supra*, 42 Cal.4th at p. 649.) The court again took an excursion through the history of the restitution statutes implementing article I, section 28, subdivision (b) of the California Constitution—both those pertaining to defendants granted probation and defendants who are not. (*Giordano*, at pp. 652–654.) In doing so, the court observed that in 1994, "[Penal Code] section 1202.4, subdivision (k) defined 'victim' to 'include the immediate surviving family of the actual victim' " (Stats. 1994, ch. 1106, § 3, pp. 6549, 6549, eff. Sept. 29, 1994), and in 1999, "the Legislature amended the definition of 'victim' in Penal Code section 1202.4, subdivision (k)(3) to include ' "[d]erivative victims" as defined in Section 13960 of the Government Code' " (which defined "victim" for purposes of the state Restitution Fund). (*Giordano*, at p. 653.)

The court also, and separately, chronicled the expansion of the "categories" of compensable losses, which, by then, were set forth in Penal Code section 1202.4, subdivision (f)(3). (*Giordano, supra*, 42 Cal.4th at p. 654.) The court reiterated that "*the scope of the losses* that must be compensated" under article I, section 28, subdivision (b) of the California Constitution "*is not clear from the text of this constitutional provision,*" and therefore the courts must "look to the statutes the Legislature has enacted to implement this constitutional provision." (*Giordano,* at p. 655, italics added.) A review of those statutes showed, said the court, that the Legislature had "limited" restitution to

34

"economic losses," with only one "exception," that being "noneconomic losses" in felony child molestation cases. (*Id.* at p. 656, italics omitted.)

The court then turned to the specifics of the case before it. It first rejected the defendant's claim that the victim's wife was not a "victim" entitled to statutory restitution. (*Giordano, supra,* 42 Cal.4th at pp. 656–657.) In doing so, the court looked to the definitional provisions of Penal Code section 1202.4, set forth in subdivision (k). As the court pointed out, the wife qualified as a "victim" under three of these provisions—she was part of the "immediate surviving family of the actual victim" (Pen. Code, § 1202.4, subd. (k)(1)), she had "sustained economic loss" as a result of the crime (*id.*, § 1202.4, subd. (k)(3)(A)), and she was a "derivative victim" as defined by the statutes governing the state Restitution Fund (*id.*, § 1202.4, subd. (k)(4)) because she had sustained " 'pecuniary loss' " as a result of the victim's death. (*Giordano,* at p. 657.) But, said the court, the wife could recover restitution only for the "economic losses that . . . she incurred personally"; she could not recover "losses on behalf of [the] deceased victim." (*Id.* at p. 657.) That said, the court went on to explain that the wife had, as a surviving spouse, sustained "economic loss." (*Id.* at pp. 658; *id.* at p. 659 ["when [the] Legislature] enacted Penal Code 1202.4, requiring that victims receive restitution for all economic losses, it did so with the presumed knowledge that courts have long understood that a surviving spouse incurs an economic loss upon the death of his or her spouse"].)

In 2008, California voters amended article I, section 28, subdivision (b) of the California Constitution by way of Proposition 9 (i.e., Marsy's Law). Article I, section 28 now accords crime victims numerous notification and participation rights, for example, the right to receive notice of "all public proceedings" at which "the defendant and the prosecutor are entitled to be present," including "parole or other post-conviction proceedings," and the right to be heard at any bail, sentencing or "post conviction release decision." (Cal. Const., article I, § 28, subd. (b)(7), (8).)

The enumerated list of rights includes the right "[t]o restitution" and states, *in the same language as originally enacted*, "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall

35

have the right to seek and secure restitution from the persons convicted of the crimes casing the losses they suffer." (Cal. Const., article I, § 28, subd. (b)(13)(A).) The amendment eliminated the provision that had allowed sentencing courts to decline to order restitution for "compelling and extraordinary" reasons, and added a directive that restitution must "be ordered from the convicted wrongdoer in every case, . . . in which a crime victim suffers a loss." (*Id.,* subd. (b)(13)(B).)

Proposition 9 also added a provision defining "victim," as follows: "As used in this section, a 'victim' is a person who suffers direct or threatened physical, psychological, or financial harm as a result of the commission or attempted commission of a crime or delinquent act. The term 'victim' also includes the person's spouse, parents, children, siblings, or guardian, and includes a lawful representative of a crime victim who is deceased, a minor, or physically or psychologically incapacitated. The term 'victim' does not include a person in custody for an offense, the accused, or a person whom the court finds would not act in the best interest of a minor victim." (Cal. Const., article I, section 28, subd. (e).)

Since the amendment of the article I, section 28 of the California Constitution the Supreme Court has decided several restitution cases, including *Runyan, supra*, 54 Cal.4th 849, wherein the court considered the extent to which a deceased victim's estate is entitled to statutory restitution. The court commenced its analysis by looking to the definition of "victim" set forth in Penal Code section 1202.4, subdivision (k). (*Runyan,* at p. 856.) "Victim" was then defined, as it is now, "to include, among others, the actual victim's immediate surviving family ([Pen. Code, § 1202.4,] subd. (k)(1)), as well as specified relatives of the actual victim, and present and certain former members of the victim's household, who sustained economic loss as a result of the crime (*id.*, subd. (k)(3)(A)–(D)). A 'victim' also include[d, as it does now,] '[a]ny corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity when that entity is a *direct* victim of a crime.' (*Id.*, subd. (k)(2). . . .)" (*Runyan, supra*, 54 Cal.4th at p. 856.)

As the court again pointed out, "[t]he case law has ascribed a precise meaning to the phrase 'direct victim,' " as that phrase has been used in several restitution statutes, and, as pertinent to the case before the court, an entity that was " 'the "immediate object[] of the [defendant's] offenses." ' " (*Runyan, supra*, 54 Cal.4th at p. 856, quoting *People v. Martinez, supra*, 36 Cal.4th at p. 393, quoting *Birkett, supra*, 21 Cal.4th at pp. 232–233.) The court thus concluded the victim's estate, itself, was not a direct victim and therefore was not entitled to statutory restitution for its own economic losses (which included net losses in value of a rare coin collection, of fencing equipment, and of the contents of the deceased victim's household goods, and various death and probate related costs). (*Runyan*, at pp. 855–856; *id*. at p. 857 [the estate was not "directly targeted and victimized by the defendant's crimes"].)

An estate may, however, as the representative of the deceased victim, recover restitution for any compensable losses incurred by the victim prior to death. (*Runyan, supra*, 54 Cal.4th at p. 857 [an estate "is a proper recipient, on the decedent's behalf, of restitution owed *to the decedent*"].) The court went on to discuss the extent of compensable loss an estate may recover as the personal representative of a deceased victim, namely "personal losses" that accrued *before* the victim died. (*Id.* at pp. 859–867.) None of the economic losses for which the estate in question sought restitution, however, qualified. Accordingly, the estate was not entitled to statutory restitution. (*Id.* at p. 867.)

In the course of reaching this conclusion, the high court emphasized two points. First, "under the terms of both Marsy's Law and [Penal Code] section 1202.4, a crime victim may recover only for losses *personally incurred by that victim*." (*Runyan, supra*, 54 Cal.4th at p. 859; *id*. at p. 860 [Penal Code "section 1202.4 and the Victims' Bill of Rights allow each defined victim to seek and obtain restitution only for that person's or entity's own personally incurred loss"].) Second, Penal Code "[s]ection 1202.4 limits eligibility for mandatory restitution to carefully defined crime 'victims' (*id*., subd. (k))" and "makes clear that those eligible . . . must be the crime's 'direct' or 'actual' victims." (*Runyan,* at p. 864; *id*. at p. 860 [the statute "defines and limits the categories of

37

'victim[s]' that are entitled to recover for the losses *they* have accrued," and these include "certain other persons who sustained economic loss as a result of the crime, including a parent, grandparent, spouse, child, or grandchild"].) "Similarly, article I, section 28 of the California Constitution, as amended by Marsy's Law, provides that a 'victim' . . . is '*a person* who suffers direct or threatened physical, psychological, or financial harm as a result of . . . a crime.' . . . Here again, the implication is that a defined victim, and only a defined victim, is entitled to restitution on *his or her own personal behalf. . . .*"[33] (*Runyan,* at p. 860.)

Turning to the case before us, the salient question, it seems to me, is whether Proposition 9 invalidated the statutory definition of "victim" set forth in Penal Code section 1202.4, subdivision (k)(3) to the extent it requires persons enumerated therein to "have sustained economic loss," because the constitutional definition of "victim" does not include this qualifier. While the majority does not view its construction of the statute as eliminating the threshold "economic loss" requirement of Penal Code section 1202.4, subdivision (k), in my view the majority has done exactly that by turning to the prefatory language of Penal Code section 1202.4, subdivision section (f)(3) and pronouncing that that language defines the "noneconomic losses" recoverable in felony child molestation cases under Penal Code section 1202.4, subdivision (f)(3)(F) to be a requisite "economic loss" under Penal Code section 1202.4, subdivision (k)(3).

---

[33] Given the analytical approach our Supreme Court has taken both before and after Marsy's Law, it seems to me that the majority, in stating it sees nothing in the language of the statute or its legislative history indicating the Legislature "intended to prohibit" restitution to "parents" for noneconomic losses (maj. opn., at pp. 17–18), is looking at the issue through the wrong end of the telescope. The restitution statutes are not a recitation of prohibitions on restitution. Rather, as the Supreme Court has repeatedly stated, these statutes implement the constitutional right to restitution through *specific authorizations* and *specific definitions*. Accordingly, in my view, we must look at these specific authorizations and specific definitions and not rely, as the majority does, on the Legislature's "silence on whether parents should qualify for awards of restitution for their noneconomic losses" and failure to "prohibit such awards." (Maj. opn., at pp. 17–18.) In any case, as I have discussed, I do not agree the Legislature has been "silent" this point.

In answering the question, as I see it, guidance may be drawn from the Supreme Court's decisions discussing article I, section 28 of the California Constitution since its enactment. This is so for two reasons. First, the substantive right to restitution as set forth in the Constitution by Proposition 8 remained unchanged by Proposition 9 (with the exception that restitution is now mandatory in every case). (Compare former Cal. Const., art. I, § 28, subd. (b) & Cal. Const., art. I, § 28, subd. (b)(13).) Second, there is no indication in the electoral materials that passage of Proposition 9 would countermand any appellate decision or restitution statute, except to the extent any decision had discussed, and any statute had allowed, discretion to not order restitution. Rather, the electoral materials indicate the electorate was focused on eliminating the discretion sentencing courts had to decline to order restitution in an exceptional case. (See Voter's Information Guide, Gen. Elec. (Nov. 4, 2008) official title and summary analysis of Prop. 9, p. 58; see also, *Birkett*, *supra,* 21 Cal.4th at pp 243–244 [examining voter materials].)

Accordingly, in approving Proposition 9, the electorate must be understood to have done so in the context of the existing law. (See *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1048 ["voters are presumed to have been aware of existing laws at the time the initiative was enacted"].)

This law established, among other things, that the constitutional right to restitution is not self-executing (e.g., *Giordano, supra*, 42 Cal.4th at p. 652) and that the Legislature is charged with enacting legislation implementing this right. (E.g., *Ibid.*) It further established that the constitutional language is general in character (e.g., *Birkett, supra*, 21 Cal.4th at p. 243), that the language setting forth the right to restitution is "ambiguous" (*ibid.*) and, specifically, that " '*the scope of the losses* that must be compensated' " under article I, section 28, subdivision (b) of the Californian Constitution " '*is not clear from the text of this constitutional provision*' " and therefore the courts must "look to the statutes the Legislature has enacted to implement this constitutional provision." (*Giordano,* at p. 655, italics added.) Finally, this law established that, given the generality of the constitutional language and its ambiguity, "the Legislature's interpretation of the measure deserves great deference" and will be upheld if the

39

Legislature has "adopted a plausible interpretation of the constitutional provision." (*Birkett,* at p. 244.)

In my view, these pronouncements by our Supreme Court compel the conclusion that Proposition 9 did not invalidate the requirement of Penal Code section 1202.4, subdivision (k)(3) that the persons enumerated therein have sustained "economic loss" as that term is commonly understood. As discussed above, the Legislature amended the statutory definition of "victim" in 2004 to add Penal Code section 1202.4, subdivision (k)(3) specifically to enable the state Restitution Fund to recoup directly from convicted offenders the assistance it provides to crime victims for *economic* loss. The "victim" definitional language added to article I, section 28 of the California Constitution by Proposition 9 four years later is completely silent as to the *kind* of losses for which any of the persons listed therein can recover restitution. In other words, while the constitutional definition specifies that a "person who suffers direct or threatened physical, psychological, or financial harm" is a "victim," it does not specify whether such a person, or any of the other persons identified in the definition, in addition to obtaining restitution for economic losses (for example, for the cost of counseling or psychological or psychiatric treatment), can also obtain restitution for noneconomic losses. The voter materials for Proposition 9 are, likewise, silent on this point. (Voter's Information Guide, Gen. Elec. (Nov. 4, 2008) official title and summary analysis of Prop. 9, p. 61.) Accordingly, the constitutional definition of "victim," like the constitutional language setting forth the right to restitution, is ambiguous in this regard.

We must therefore "look to the statutes the Legislature has enacted to implement this constitutional provision." (*Giordano, supra,* 42 Cal.4th at p. 655.) We must also accord the Legislature's interpretation of the right to restitution "great deference," and uphold the implementing legislation if the Legislature has "adopted a plausible interpretation of the constitutional provision." (*Birkett, supra,* 21 Cal.4th at p. 244.) Given that there is no indication the electorate intended to alter the established law that restitution is generally limited to "economic losses," in my view we must conclude that

40

Penal Code section 1202.4, subdivision (k)(3) *continues* to be a "plausible interpretation" of the provisions setting forth the constitutional right to restitution.

The majority cites *Scott H., supra,* 221 Cal.App.4th at p. 515 as further support for its view that article I, section 28 of the California Constitution as amended supports its construction of Penal Code section 1202.4. However, the court in *Scott H.* addressed an issue entirely different than that before us. In that case, the minor defendant was convicted of committing a lewd act on another minor, and the prosecution sought restitution for the "fees incurred for mental health services" for both the minor victim and his family. (*Scott H.,* at pp. 518–519.) Because they sought restitution for *economic losses*, the family members were clearly "victims" as defined by Penal Code section 1202.4, subdivision (k)(3)(A). However, they were not "victims" as defined by the restitution statute applicable to juvenile offenders, Welfare and Institutions Code section 730.6. (*Scott H.,* at p. 518 [while "Penal Code section 1202.4 contains derivative victims in its definition of victim[,] [Welfare and Institutions Code] section 730.6 does not"].)[34] Accordingly, the Court of Appeal concluded the family members were not entitled to restitution under the controlling statute. (*Id.* at p. 518.) The Supreme Court granted review on its own motion and remanded for the court to reconsider the case in light of the amendments to the constitutional right to restitution made by Proposition 9. (*Ibid.*)

Taking another look at the case, the Court of Appeal concluded it was "constrained by the Constitution to interpret [Welfare and Institutions Code] section 730.6 to include family members." (*Scott H., supra*, 221 Cal.App.4th at p. 520.) In the course of reaching this conclusion, the court contrasted the definition of "victim" in Welfare and Institutions Code section 730.6, subdivision (j), with the definition of "victim" in Penal Code section 1202.4, subdivision (k)(3). The definition of "victim" in Welfare and Institutions Code section 730.6, subdivision (j) included only "[t]he immediate surviving family of the victim" and governmental entities which incurred

---

[34] Notably, the *Scott H.* court referred to the minor victim's parents, as "derivative victims." (*Scott H., supra,* 221 Cal.App.4th at pp. 518–519.)

41

costs in cleaning up graffiti. (Former Welf. & Inst. Code, §730.6, subd. (j)(1), (2), Stats. 2014, ch. 760, § 7.) In short, the juvenile statute had never been expanded, as had the definition of "victim" in Penal Code section 1202.4, to include "derivative victims." (*Scott H.,* at p. 521.) Given that the constitutional definition of "victim" includes " 'the person's' " " 'parents' " and " 'siblings,' " and also refers to a "person" who is the victim of a " 'delinquent act,' " the court concluded this language "prevail[ed]" over Welfare and Institutions Code section 730.6's limited definition and therefore "derivative victims," like the victim's family members, were entitled to statutory restitution. (*Scott H.,* at p. 522, italics omitted.)

Thus, the *Scott H.* court had no occasion to, nor did it, discuss the issue before us, which concerns the "scope of the losses" which "derivative" victims, such as Mother, can recover as statutory restitution. And specifically, the *Scott H*. court did not consider whether Mother, by seeking restitution for "noneconomic losses" under Penal Code section 1202.4, subdivision (f)(3)(F), has thereby sustained "economic loss" under Penal Code section 1202.4, subdivision (k)(3), which thereby qualifies her as a "victim" under that subdivision and entitles her to restitution for "noneconomic losses" under Penal Code section 1202.4, subdivision (f)(3)(F). For all the reasons I have discussed, I cannot subscribe to this circular reasoning which, in my view, disregards both the language and the Legislature's intent in enacting the statutory provisions with which we are concerned.

42

_____
Banke, J.

A150250, *People v. Montiel*

Trial Court:

Napa County Superior Court


Trial Judge:

Hon. Diane M. Price


Counsel for Defendant and Appellant:

William J. Capriola, under appointment by the Court of Appeal


Counsel for Plaintiff and Respondent:

Xavier Becerra, Attorney General

Gerald A. Engler, Chief Assistant Attorney General

Jeffrey M. Laurence, Senior Assistant Attorney General

René A. Chacón, Supervising Deputy Attorney General

Ashley Harlan, Deputy Attorney General


*People v. Montiel*  A150250


1